OPINION OP THE COURT
Meyer, J.
 The common-law right of the New York Racing Association (NYRA) to exclude persons from its premises includes the right when there is reasonable cause to believe a jockey licensed by the New York State Racing and Wagering Board (the Board) guilty of misconduct to deny him access. In doing so, however, NYRA must conform to the requirements of due process. Although a presuspension *235 hearing is not in all cases a due process requirement, due process was violated by the exclusion of petitioner without prior hearing or notice to him concerning the claimed misconduct. The order of the Appellate Division should, therefore, be modified by deleting therefrom so much as struck from Special Term’s order the provision permitting NYRA to bring a subsequent expulsion proceeding and as so modified, should be affirmed.
NYRA, which owns and operates Aqueduct, Belmont Park and Saratoga racetracks, is incorporated under what is now section 202 of the Racing, Pari-Mutuel Wagering and Breeding Law (L 1982, ch 865, eff April 1, 1983) “for the purpose of conducting races and race meetings * * * and serving the best interest of racing generally.” Under that section it has “all the general powers of corporations created under the laws of this state, including the powers and obligations of stock corporations” (id., subd 3). It operates under a 25-year franchise granted by the Board (id., § 208). The Board is a State agency (id., § 101) empowered to license running races and race meetings (id., § 207) and to license participants in and employees at race meetings, including jockeys (id., § 213).
Petitioner is a jockey licensed by the Board. In an article 78 proceeding against both NYRA and the Board, he alleged that NYRA had usurped the power of the Board by summarily revoking his license on July 12,1981, based on an asserted violation of a Board rule (9 NYCRR 4042.1 [e]) that occurred three weeks prior, on June 22, 1981; that NYRA was without authority to do so; and that summary revocation was imposed without a hearing in violation of the State Administrative Procedure Act and his right to due process under the United States Constitution. His petition asked judgment enjoining NYRA from depriving him of rights incident to his license and directing the Board to insure that NYRA not interfere with the Board’s licensing function.
Supreme Court, Queens County, on the petition and affidavits presented granted the petition, annulled NYRA’s July 12,1981 determination and enjoined NYRA and the Board from any action impeding petitioner’s rights under his license, without prejudice, however, to a hearing *236 being held by either respondent. It did so on the ground that the Board had neither made any charge nor held the hearing required by subdivision 3 of section 213 of the Racing, Pari-Mutuel Wagering and Breeding Law and that subdivision 3 of section 401 of the State Administrative Procedure Act and the due process clause of the Federal Constitution required a presuspension hearing, absent a finding that the public welfare required emergency action, before NYRA could deny access.
The Appellate Division modified on the law by deleting the decretal provision permitting NYRA to proceed with a hearing and dismissed the proceeding as to the Board. It recognized NYRA’s duty to help insure the interests of legitimate racing and held that although NYRA’s decision to act quickly in furtherance of those interests did not infringe upon Board authority while the Board itself was considering disciplinary action, the Board having taken no action against petitioner, his continued suspension by NYRA infringed upon the Board’s licensing authority. The matter is before us by leave of the Appellate Division.
Neither court below made express findings of fact and the affidavits of the parties conflict concerning the nature of the hearing offered by NYRA. It would, therefore, be necessary to remand were it not for our conclusion that, considered in the light most favorable to NYRA, the papers do not establish a basis for its exclusion of petitioner from its facilities without a presuspension hearing. Those papers show that op June 22, 1981, petitioner rode horse No. 7 of eight horses competing in the second race. As the horse approached the starting gate, into which the first six horses had already entered, and when it was about 15 feet from the gate, Dr. Gilman, the NYRA examining veterinarian, observed an object hit the left side of the rib cage of the horse and fall to the track. He picked up the object and in placing it in his pocket received a severe electric shock. It was turned over to the NYRA steward and a memorandum of the incident was made that day by Dr. Gilman.
An investigation was undertaken by NYRA, which also notified the Board of the incident. During the investigation, petitioner was twice requested to submit to a lie detector test and declined both requests. During such a test *237 on July 10, 1981 of the trainer of the horse petitioner had ridden on June 22, the trainer, after having been told after denying knowledge of the matter that the detector indicated he was not telling the truth, is alleged to have said that petitioner told him after the race that “I dropped my gator. I think the Doctor picked it up.” On July 12, 1981, NYRA’s president caused to be served on petitioner a letter informing him that “[o]n the basis of all the information presently before us” he was denied access to NYRA tracks until further notice but that NYRA would “provide you and your counsel with an immediate opportunity to be heard before a panel appointed by me.” The basis for the exclusion was stated to be that petitioner was on June 22, 1981 in possession of an illegal electrical device, that possession of such a device was a violation of Board regulations, that petitioner during the investigation “failed to cooperate fully” and that NYRA had a vital interest in “assuring that patrons have confidence that the sport is being honestly conducted.”
Separate investigations were thereafter conducted by the Board and by the Nassau County District Attorney. During those investigations the trainer is alleged to have denied making the statement attributed to him by NYRA’s investigator. On July 22,1981, the Grand Jury declined to indict. The Board has since taken no disciplinary action against petitioner but on this appeal urges that “the order of the Appellate Division should be reversed to the extent it denies racetracks the right to exclude licensees in the exercise of sound business judgment.” NYRA concedes for the purposes of this proceeding that its exclusion of petitioner constitutes “State action.”
 We conclude that NYRA retains its common-law right of exclusion and is not governed by the State Administrative Procedure Act, but that in view of its State action concession and the substantial rights of which exclusion deprived petitioner it was a violation of petitioner’s constitutional rights to exclude him from NYRA facilities without a prior hearing. We, therefore, modify the Appellate Division’s order as above indicated.
*238 I
It is not entirely clear from the Appellate Division memorandum whether it predicated its holding upon pre-emption, as its citation of Jacobson v New York Racing Assn. (33 NY2d 144, 150) suggests, or an improper delegation of power, as is suggested by its citation of Matter of Capital Dist. Regional Off-Track Betting Corp. v New York State Racing & Wagering Bd. (54 NY2d 154) and Matter of Fink v Cole (302 NY 216). In our view neither doctrine bars NYRA’s exclusion of petitioner from its premises.
Involved in this case are two separate and distinct rights. Jacobson held only that a racetrack proprietor’s common-law right to exclude undesirable patrons without reason or excuse, so long as not discriminatory, did not extend to persons licensed by the State, as to whom, however, exclusion in “the best interest of racing generally” and in the exercise of “a reasonable discretionary business judgment” was permissible (33 NY2d, at p 150). Matter of Fink held no more than that the Legislature cannot constitutionally delegate to a private corporation its power to license participants and employees at race meetings, and the Capital Dist. holding is no broader (see 54 NY2d, at p 158).
Here there exists no delegation of the licensing power, that function having been given only to the Board (Racing, Pari-Mutuel Wagering and Breeding Law, § 213). Nor is there anything in the latter statute to suggest that the Legislature intended to pre-empt NYRA’s common-law power of exclusion (cf. People v De Jesus, 54 NY2d 465; Monroe-Livingston Sanitary Landfill v Town of Caledonia, 51 NY2d 679, 683; Robin v Incorporated Vil. of Hempstead, 30 NY2d 347) and the Board, by regulation (9 NYCRR 4022.12), has explicitly recognized that that common-law power continues.[1] That in practical effect NYRA’s power of
*239 exclusion may infringe upon a licensee’s ability to follow at NYRA’s tracks the pursuit for which licensed should not for that reason alone be given pre-emptive effect, for the Board has full authority to protect its licensing power through revocation of NYRA’s franchise (see Racing, PariMutuel Wagering and Breeding Law, § 208, subd 6; § 210).
The licensing power of the Board being independent of and separate from NYRA’s common-law right to exclude a licensed person in the best interests of racing,[2] the fact that the Board has taken no action to revoke petitioner’s license had no bearing upon the right of NYRA to exclude petitioner in the first instance or upon the continued effectiveness of the exclusion previously effected by NYRA.
II
Whether petitioner was excluded in conformance with applicable statutory and constitutional requirements remains for discussion. Subdivision 3 of section 213 of the Racing, Pari-Mutuel Wagering and Breeding Law requires notice and a hearing before revocation of a license but by its terms is limited to a revocation by the Board. Subdivision 3 of section 401 of the State Administrative Procedure Act limits summary suspension to a situation which “imperatively requires emergency action” but can be applied to NYRA only if it is “a public benefit corporation or public authority at least one of whose members is appointed by the governor” (State Administrative Procedure Act, § 102, subd 1). NYRA has directors or trustees and stockholders, not members, and is a private corporation (Racing, PariMutuel Wagering and Breeding Law, § 202, subd 3), not a *240 public benefit corporation (General Construction Law, § 66, subd 4). Nor is NYRA’s concession for the purposes of this proceeding that its determination to exclude petitioner constitutes “State action” any reason for invoking the State Administrative Procedure Act, to the extent that the requirement of subdivision 3 of section 401 exceeds the requirements of due process.
The issue is thus reduced to whether, “State action” being so conceded, petitioner’s exclusion without a prior hearing conforms with the requirements of due process. Determination of that question requires a balancing of three factors: (1) the private interest affected, (2) the possibility of error in the procedure used and the probable value of other or additional procedural safeguards, and (3) the interest protected by the “State action” taken and the burdens that other or additional safeguards would impose (Memphis Light, Gas & Water Div. v Craft, 436 US 1, 17; Mathews v Eldridge, 424 US 319, 334-335). Here NYRA’s interest in assuring confidence in the honesty of its activities would have sustained a prehearing exclusion had such a determination followed promptly after the incident and been followed by the offer of an immediate hearing. Having demonstrated by delaying exclusion for 20 days that the incident created no crisis of confidence, however, NYRA could not then impose upon petitioner the substantial deprivation[3] resulting from exclusion without first affording him a hearing.
The Memphis Light case and Barry v Barchi (443 US 55) provide the framework for that conclusion. Memphis Light established “ ‘some kind of hearing’ prior to the deprivation of a significant property interest” as the rule (436 US, at p 19; see, also, Parratt v Taylor, 451 US 527, 540; Friendly, “Some Kind of Hearing”, 123 U of Pa L Rev 1267), but recognized that under appropriate circumstances an “informal consultation” could suffice (436 US, at p 16, n 17) and that prehearing deprivation would be permissible if the deprivation was not serious and the procedure used *241 sufficiently reliable (436 US, at p 19). It held, however, that the deprivation of utility service for any appreciable time and the possibility of error in utility cutoff decisions were sufficiently great to require a hearing prior to termination. Barry recognized that a horse trainer’s property interest in his license was sufficient to invoke the protection of the due process clause and that the trainer’s interest in avoiding suspension was substantial, but held the State’s interest in preserving the integrity of racing and protecting the public from harm sufficiently great and probable cause to believe that a horse had been drugged through the trainer’s negligence, at least, sufficiently established to authorize prehearing suspension followed by a prompt hearing and disposition of the issue.
Postponement of suspension “pending an adversary hearing to resolve questions of credibility and conflicts in the evidence” was not required in Barry because there existed an affirmance by the State’s expert, based on urinalysis, that the horse in question had been drugged, because the trainer worked under a Board rule which established a rebuttable presumption based on drugging that the trainer was at least negligent, and because the trainer was notified immediately of the alleged drugging, 16 days elapsed between that notice and the denial of access and he was given more than one opportunity to present his side of the story to the State’s investigator and had in fact done so without demonstrating convincingly that he was not negligent (443 US, at p 64).
The interests of petitioner and NYRA in this case are the same as the interests of Barchi and the State in Barry, but the present case stands in stark contrast to Barry with respect to the reliability of the procedure used and the risk of erroneous determination. Here no rebuttable presumption existed, and though it appears that petitioner twice declined the opportunity to take a lie detector test, nothing in the record establishes that he was advised why he was being offered the opportunity, was told why the investigation was being made, or was informed that he was the object of it. So far as the record discloses, petitioner was first advised of the charge not two days after the event, as was Barchi, but 20 days after, when he received NYRA’s *242 exclusion letter. Although Barchi had 14 days after being so advised in which to attempt to clear himself before suspension, petitioner had, so far as appears, no benefit from the 20 days that elapsed and was faced with the Hobson’s choice of an immediate hearing without a full opportunity to prepare or deferring the hearing for a sufficient time to prepare but with consequent loss of income.
In contrast to the chemical evidence of illegal drugging by someone in Barry, stands the much less incriminating facts that while Dr. Gilman saw the device hit the rib cage of the horse he could not say from where it came, nor, other than his statement that the horse made no sudden movement when the object hit its left side, is there anything to suggest that it came from or had ever been in the possession of petitioner rather than that of some third person. True there was a statement from the trainer of the horse detailing an admission by petitioner, but the reliability of the statement in view of the trainer’s possible inculpation in the use of such a device was very much more open to question[4] than was the Barry evidence. Finally, the conduct of which Barchi was accused was negligently allowing the horse to be drugged, whereas petitioner was accused of a crime; one is an intentional and the other a negligent act. Although NYRA was not obligated to resolve questions of credibility before denying petitioner access to its facilities, the evidence as to possession of the battery upon the basis of which NYRA acted was at best equivocal and, in light of the 20-day delay and the importance of access to petitioner’s livelihood, an insufficient basis for exclusion without a hearing. Nor did the accusation of failure to co-operate in the investigation authorize such an exclusion, for the record discloses nothing about the circumstances under which he was requested to co-operate, or, indeed, whether any request other than that he take a lie detector test was made (cf. Gilmour v New York State Racing & Wagering Bd., 405 F Supp 458).
That NYRA improperly denied petitioner’s right of access without a hearing does not, however, foreclose its *243 right to proceed with a hearing as a basis for exclusion if it be so advised. Although we need not, in view of the conclusion reached, consider all of the factual and legal issues relating to the nature of the hearing offered, we deem it not improper in view of the possibility that such a hearing may be held, to note that nothing in the record establishes that President Heffernan, who signed the July 12 letter, would be a member of the hearing panel or have any relation to it other than as the appointment authority, and that there would be no constitutional impropriety in his appointing the panel (Withrow v Larkin, 421 US 35, 56-58; Wolff v McDonnell, 418 US 539, 570-571; Richardson v Perales, 402 US 389, 410; Goldberg v Kelly, 397 US 254, 271).
Accordingly, the order of the Appellate Division should be modified as above indicated and, as so modified, affirmed.

. The regulation which deals with the power of the Board steward to exclude persons from the track or suspend a license for up to 60 days concludes with the statement that: “Nothing in this section shall be construed to limit any racing association or track licensee’s power to exclude or deny any individual from its grounds or privileges thereon.” The suggestion in Chief Judge Cooke’s dissenting in part opinion (n *239 2) that the Board misconstrues its statutory authority assumes that by doing so the Board has delegated its licensing authority. But the extent to which an agency with licensing power should exercise it is a question of “ judgment, discretion, allocation of resources and priorities [which is! inappropriate for resolution in the judicial arena’ ” (see Jones v Beame, 45 NY2d 402, 407; Matter of Kerness v Berle, 85 AD2d 695, affd 57 NY2d 1042).

. The Appellate Division’s conclusion that petitioner’s exclusion “is based solely on an alleged infraction of a rule of the board” (86 AD2d, at p 606) is not sustained by the record. The infraction, if there was one, violated not only the Penal Law (88 110.00, 180.50) and the rules of the Board (9 NYCRR 4042.1 [eb but was also contrary to the best interests of racing. NYRA’s July 12 letter referred both to petitioner’s possession of “an illegal electrical device” and to the fact that possession was a Board rule violation, but petitioner’s exclusion was stated to be the result of NYRA’s determination “in the exercise of our independent judgment, that our investment in our operations, as well as public perception of thoroughbred racing generally, could be seriously compromised if you continue to have access to our facilities.”

. NYRA has “virtual monopoly power over thoroughbred racing in the State of New York” (Jacobson v New York Racing Assn., 33 NY2d 144, 149). Moreover, petitioner’s affidavit indicated that as a result of NYRA’s action he had been deprived of the right to ride at a New Jersey track.

. Not considered in this evaluation because they came after the suspension are the trainer’s later contradictory statements and the failure of the Grand Jury to indict and the Board to institute a proceeding to discipline petitioner or revoke his license.