Gene STEVENS, Plaintiff,

v.

NEW YORK RACING ASSOCIATION, INC., Defendant.

No. CV–87–1831.

United States District Court, E.D. New York.

July 28, 1987.

Summit Rovins & Feldesman, New York City, for plaintiff; by Ira G. Greenberg.

Cahill Gordon & Reindel, New York City, for defendant; by H. Richard Schumacher, Patricia Dobberstein.

**MEMORANDUM DECISION
AND ORDER**

SIFTON, District Judge.

Plaintiff, a publisher of a horse racing newspaper, commenced this action against defendant, New York Racing Association, Inc. ("NYRA"), based upon allegations that defendant's conduct limiting plaintiff's ability to take or be in photographs at defendant's racing tracks violates plaintiff's rights under the first and fourteenth amendments to the United States Constitution as well as under New York State law. This Court's jurisdiction is invoked pursuant to 28 U.S.C. §§ 1331–32, § 1343, and principles of pendent jurisdiction.

The matter is currently before the Court on plaintiff's application for an order enjoining defendant, pending the trial of this action, from (1) denying plaintiff and a photographer employed by him access to areas of defendant's tracks which are otherwise open to the press, and (2) barring plaintiff from taking and being in photographs in all areas of defendant's tracks where members of the press take such photographs, pursuant to Rule 65 of the Federal Rules of Civil Procedure. Defendant has cross-moved for summary judgment pursuant to Rule 56.

On July 2, 1987, the Court granted plaintiff's request for a hearing to determine whether defendant should be enjoined from restricting plaintiff's ability to take and be in photographs at defendant's tracks pending a trial on the merits. The Court also granted plaintiff's application for expedited discovery in advance of the hearing. During the week of July 6th, plaintiff served and defendant answered limited interrogatories and document requests. On July 9, 1987, plaintiff took the depositions of defendant's president, Gerard McKeon, and defendant's executive director of media relations, Steven Schwartz. On July 10, 1987, the Court granted the parties' request to submit affidavits, memoranda, and the deposition transcripts in lieu of conducting a hearing with live testimony.

Based upon the affidavits, exhibits, and discovery materials submitted in connection with these applications, plaintiff's application for a preliminary injunction is granted, and defendant's motion for summary judgment is granted in part and denied in part. The following constitutes the Court's findings of fact and conclusions of law on which these determinations are founded as required by Rule 65(d).

Plaintiff, a citizen of Florida, is the publisher of *Post Time USA,* a newspaper that reports on the thoroughbred horse racing industry. Plaintiff's newspaper concentrates its coverage on the "racing social scene" and includes "photographs of racing personalities." Plaintiff's Aff. ¶ 3. Indeed, it appears from copies of plaintiff's newspaper that such photographs of racing people, including pictures of the plaintiff himself, are an important part of *Post Time USA*'s coverage. Plaintiff credibly states that such photojournalism is important to maintaining readership interest and securing advertising and that access to all parts of a race track is "crucial" to fulfilling these objectives. *Id.* The copies of plaintiff's newspaper which have been submitted as exhibits to plaintiff's affidavit indicate that plaintiff devotes several articles and "photo pages" to defendant's events, such as the Belmont Stakes and the Saratoga meet. Indeed, the August 1985 edition is entitled "Triple Crown Review & Saratoga Issue." *Cf.* Plaintiff's Reply Aff. ¶ 12 (two entire issues devoted to defendant's events).

Defendant is a New York stock corporation organized as a non-profit racing association under the authority of N.Y. Racing, Pari-Mutuel Wagering & Breeding Law (hereafter "Racing Law") § 202. Defendant owns and operates the Aqueduct, Belmont Park, and Saratoga thoroughbred racing tracks. Defendant issues a variety of credentials to members of the press to cover events at its tracks. These credentials generally give press representatives access to areas of the racing tracks such as the paddock[1] which are closed to paying patrons. The press is given access to the paddock so that, for example, representatives can see the condition of the horses before the race and talk to the trainer if the trainer is available. To take photographs in the paddock, a journalist must obtain a photographer's credential. There is no dispute that members of the press with the requisite credentials take photographs in the paddock area of defendant's tracks.

The events that resulted in this lawsuit involve defendant's decision to limit plaintiff's ability to take and be in photographs at defendant's racing tracks. At some point prior to the August 1986 meet at Saratoga, Mr. Schwartz, who decides in the first instance whether to grant a request for press credentials, denied plaintiff's request for working credentials. Mr. Schwartz testified that the decision to deny plaintiff's request was based upon information that he received from others.

Messrs. Rudy and Allen, respectively the former and current press directors at Churchill Downs, the site of the Kentucky Derby, has told Mr. Schwartz "over the years" that plaintiff had to be forcibly ejected from the press box at Churchill Downs because he appeared without credentials and that plaintiff, during the 1984 running of the Kentucky Derby, stationed himself behind ABC's television presentation in the paddock. As a result, Schwartz was advised that Churchill Downs no longer issues credentials to plaintiff.

In addition, plaintiff once appeared at the press box at Belmont Park, one of defendant's tracks, without a credential. He did not have to be forcibly removed, however. When told he needed a credential, plaintiff went to Mr. Schwartz who allowed him to visit the press box.

Mr. Keenan, who is in charge of security at defendant's tracks, told Mr. Schwartz that plaintiff's "actions weren't those of a normal reporter" but provided Mr.

---

[1]. In the paddock, the horses participating in an upcoming race are saddled by the trainer; the owner, trainer, and jockey discuss race strategy; and the riders are instructed to mount the horses, which are then led around a walking ring so that the public can view the horses' condition. *See* McKeon Dep. at 35–36; Schwartz Aff. ¶ 9 n. 2.

Schwartz with no particular information about plaintiff's conduct. Schwartz Dep. at 23. Ms. Garges, who is responsible for clubhouse activities, told Mr. Schwartz that "she felt [plaintiff] was a general nuisance," which Mr. Schwartz took to mean that plaintiff was "extremely visible" during a meet at Saratoga. *Id.* at 24–25. Mr. Scherf, who was defendant's press director, worked with Mr. Schwartz during an incident involving plaintiff which occurred during the 1981 running of the Gotham Stakes. At that time, plaintiff "managed to get himself into the winner's circle picture taken by the *New York Times*" without a credential. *Id.* at 20–21. After the incident, plaintiff wrote to defendant explaining that, because he participated in the sale of the winning horse, he was invited into the winner's circle by the owner. Mr. Schwartz did not believe the explanation because the letter contained a statement that Mr. Scherf had apologized to plaintiff, which Mr. Schwartz believed to be false.

Beyond the statements which these five individuals made to Mr. Schwartz, it also appears that Mr. Schwartz decided to deny plaintiff a credential because plaintiff, by taking and being in photographs, "was making himself bigger than the event" he was covering. Schwartz Dep. at 47. Mr. Schwartz' decision was also based on his belief that plaintiff, through his activities, was promoting himself at defendant's expense. Mr. Schwartz' decision was not based on any conversations with or complaints from horse owners, trainers, or jockeys concerning plaintiff's activities.

When Mr. Schwartz denied plaintiff's request for a press credential in 1986, he did not explain to plaintiff the reason for the decision.

Thereafter, plaintiff approached Mr. McKeon, defendant's president and Mr. Schwartz' boss, to obtain a credential. Mr. McKeon decided to give plaintiff a credential but to prohibit him from bringing a camera into the paddock. Mr. McKeon testified that he imposed the photography restriction for a number of reasons. First, in 1984 or 1985, Mr. McKeon was taken by the arm and led into a picture with plaintiff in the paddock at Saratoga. Mr. McKeon has seen plaintiff lead—or in Mr. McKeon's words "collar"—other people into pictures on occasion. Second, Ms. Garges would occasionally complain to him, "[w]hat is [plaintiff] doing in the paddock with that camera." McKeon Dep. at 12. She never related a complaint to Mr. McKeon from any individual, however. Third, Mr. Schwartz, without relating any specific complaints, "expressed his irritation with [plaintiff's] collaring people in the paddock for pictures." *Id.* at 14. The decision to impose a photography restriction on plaintiff, however, was not based on the fact that plaintiff's conduct was interfering with the regular activities in the paddock area.

Upon making the decision Mr. McKeon testified that he told plaintiff that

"... you are going to get press credentials just like everybody else, but I don't want you going into the paddock area with the camera because some people have complained to me, and I find it personally offensive to be collared while in the paddock[;] so if you want to take pictures, put your cameraman on the rail, surrounding the paddock, and have him shoot you from there. Or in the alternative, if you want to take a picture with somebody, do it when you are outside of the paddock."

McKeon Dep. at 16–17.

There is some question as to the breadth of the restriction that defendant imposed on plaintiff. In contrast to the restriction described by Mr. McKeon, Mr. Schwartz testified that, after he discussed the limitation with Mr. McKeon, he told plaintiff that he could not take or be in pictures "anywhere in the track." Schwartz Dep. at 44. Defendant is currently prepared to issue plaintiff a credential which would give plaintiff access to the paddock area of defendant's racing tracks provided that neither plaintiff nor persons accompanying him are carrying cameras. *See* Defendant's Answer to Interrogatory No. 2(a).

In all events, after accepting the restricted credential, plaintiff and his counsel, between November 1986 and May 1987, at-

tempted to obtain an unrestricted press pass for plaintiff to cover the June 1987 Belmont Stakes and the August 1987 Saratoga meet. In a letter dated May 8, 1987, Mr. Lieberman, defendant's vice president of operations and general counsel, advised plaintiff's lawyer that:

"Mr. Stevens recently wrote to us requesting press credentials to cover the Belmont Stakes on June 6 and our Saratoga meeting in August. He asked that they be without the restrictions on paddock photography by him or at his behest that we felt compelled to enforce last year by reason of his disruptive use of cameras in the paddock areas of our tracks. There was no indication by Mr. Stevens that he was prepared, of his own volition, to abstain from any of the objectionable behavior that occasioned last year's limitations.

"We have carefully considered Mr. Stevens' request in the light of our responsibility, as a business, to seek to spare from unreasonable annoyance those who participate in and/or who attend races at our tracks. While we are pleased that Mr. Stevens wishes to cover the Belmont Stakes and Saratoga meeting and are prepared to issue him press credentials for those events, we have concluded that they must include the same restrictions as to paddock photography that have recently applied."

Plaintiff disputes this characterization of his conduct. In his affidavit, plaintiff alleges that, except in "candid" shots, he always asks the people he is photographing for permission. ¶ 5. He also avers that *Post Time USA*'s "pictures are taken at a convenient time for everyone concerned" and "not at the last minute after the horses are in the paddock." Reply Aff. at ¶ 8.

Plaintiff also avers that the rationale for the restriction—that his conduct is disruptive and annoying to participants—is pretextual. He alleges that Mr. Schwartz told him "off the record" that plaintiff was "pissing people off" at NYRA, that NYRA officials believed his style was too pushy and flamboyant, and that plaintiff was making himself bigger than the event he

was covering. Aff. at ¶ 7; Reply Aff. at ¶ 6.

In all events, because defendant would not grant plaintiff an unrestricted press pass for the Belmont and Saratoga races, plaintiff filed this action on June 4, 1987. On that same day, plaintiff sought a temporary restraining order prohibiting defendant from restricting plaintiff's ability to take and be in photographs in the paddock area for the Belmont States on June 6, 1987. The undersigned denied plaintiff's application on the ground that, since the dispute about the paddock camera restriction had been in existence for nearly a year, plaintiff could have avoided the need for temporary relief by commencing an action earlier. On June 6, plaintiff accepted press credentials from defendant for the Belmont Stakes, which included the paddock photography restriction, "without prejudice to further litigation."

In 1955, the New York legislature, in response to a Jockey Club plan which was designed to improve thoroughbred racing revenues, enacted a statute that authorized the incorporation of a non-profit racing association to acquire and conduct races at the Belmont, Aqueduct, and Saratoga race tracks. *See* L.1955, ch. 812, § 1–a; *Halpern v. Lomenzo*, 81 Misc.2d 467, 469, 367 N.Y.S.2d 653 (Sup.Ct.N.Y.Co.1975). The legislature authorized the creation of such an association in part in order to "provide reasonable revenue for the support of government" and to establish thoroughbred racing and pari-mutuel betting "on such a footing that it will command the interest as well as the confidence and favorable opinion of the public." N.Y.Racing Law § 208(9)(d)(4); N.Y. Const. art. I, § 9. Purusant to this statute, twenty "leaders of the turf" organized defendant NYRA as a New York stock corporation, served as its initial directors (called "trustees"), and became defendant's initial shareholders by contributing $50 each for a total capitalization of $1,000.

Shortly after its creation, defendant NYRA applied to the New York State Racing and Wagering Board (hereafter the "Racing Board"), as required by L.1955, ch.

812, § 7–b, for the needed approval to purchase its three race track properties. *See* N.Y.Racing Law § 208(9)(c). To raise money to acquire the tracks, defendant borrowed funds from a consortium of banks headed by Morgan Guaranty by pledging the underlying property. *See* McKeon Dep. at 50–51. Because defendant's total capitalization was and is $1,000, the state adjusted defendant's tax burden in various ways in order to ensure lenders that these loans would be discharged. Thus, between 1955 and 1964, the legislature exempted $5,000,000 of defendant's pari-mutuel revenues from taxes and allowed defendant to use the available funds for various corporate purposes, including "the payment of the cost of amortization of debt." L.1955, ch. 813, § 9–a(3). In addition, in 1957 the state increased defendant's share of the wagering pool from 4% to 5% through 1965 until defendant's "indebtedness to banks ... in an amount of eight million dollars shall have been discharged." L.1957, ch. 355, § 1. At various times thereafter, the state has extended the 1% increase in defendant's share in order to satisfy defendant's long-term indebtedness and modernize the race tracks. Such extensions have been enacted in order to increase admissions and betting pools for the benefit of the state. L.1983, ch. 687, § 1; *Halpern, supra,* 81 Misc.2d at 472–73, 367 N.Y.S.2d 653.

With the exception of the Finger Lakes race track in Canandaigua, New York, defendant's three race tracks provide the only thoroughbred horse racing in the state. Under the statutory scheme, defendant conducts thoroughbred racing and pari-mutuel wagering pursuant to franchises issued by the Racing Board. *See* N.Y.Racing Law § 208. Its principal source of revenue is a portion, fixed by statute, of the amounts wagered on races. *See* N.Y. Racing Law § 229. Defendant also earns money from admission fees, parking lot charges, concession sales,[2] and the like. Defendant, however, keeps very few of these revenues for itself. The statute provides that, after defendant covers its expenses, defendant must pay to the state a "franchise fee." *See* N.Y.Racing Law § 208(1). The fee is equal to defendant's "entire adjusted net income," which constitutes all of defendant's federal taxable income. McKeon Dep. at 39–41. Beyond paying all of its profit to the state in the form of a franchise fee, defendant's revenues are subject to the normal run of business taxes. The Racing Law prohibits defendant from distributing or paying revenues or assets to its shareholders in the form of dividends. N.Y.Racing Law § 202(1). Because of the extensive levies imposed on defendant's operations, it paid $60 million to the State Tax Commission in 1986.

While defendant does not receive payments of funds from the state directly, it borrows money for capital construction at its three race tracks from the Thoroughbred Racing Capital Investment Fund (the "Fund"), a state agency created in 1983. To obtain funds, defendant must covenant with the agency to derive reasonable revenues for the support of government, *see* N.Y.Racing Law § 255(2); submit a capital plan for the Racing Board on which the state's budget director must give an opinion as to whether defendant can be expected to repay the loan within the term of its franchise; and prepare a report for the governor, the temporary president of the senate, the speaker of the assembly, and others indicating whether it can meet all of its obligations. N.Y.Racing Law § 258(1). If not, defendant may apply to the Fund for a deferral. N.Y.Racing Law § 257(4). Defendant has borrowed $17 million from the Fund. Defendant pays back the Fund with money which it takes as depreciation expenses. Had defendant not obtained loans and capital assets, the monies now being paid to the Fund in the form of depreciation cash flow would be going to the state as part of the franchise fee.

With respect to corporate organization, defendant is directed by twenty trustees who are also its shareholders. When vacancies in the board of trustees appear, the

---

**2.** The Racing Law requires that defendant, in awarding concession contracts, use the competitive bidding process approved by the state budget director. § 208(7).

remaining trustees nominate a successor who must be approved by the Racing Board. *See* N.Y.Racing Law § 202(3). The Racing Board is empowered to remove trustees from their position for, among other things, action which the Racing Board considers "not to be in the best interests of racing generally." N.Y.Racing Law § 202(3). Since 1976, the governor of the state must appoint three members to the defendant's board of trustees for terms of two years. N.Y.Racing Law § 202(4).

The defendant is endowed by statute with a variety of powers and duties. One power granted to the trustees of defendant is the power to appoint "five or more special policemen ... who ... shall be peace officers with the same powers within and about such grounds as are set forth in section 2.20 of the criminal procedure law." N.Y.Racing Law § 215.

With regard to defendant's dealings with the press, the Racing Law provides that "[t]he issuance of free passes, cards or badges" to "persons actually employed and accredited by the press to attend" horse races "shall be under the rules and regulations of the state [R]acing ... [B]oard." N.Y.Racing Law § 236. The statute also requires that defendant file "a list of all persons to whom free passes, cards or badges are issued" with the Racing Board. *Id.* Mr. Schwartz alleges, however, that all decisions as to whether to issue press credential are made by him or one of his supervisors in NYRA without reference to any rules of regulations of the Racing Board. He also alleges that none of defendant's actions in regard to issuing or denying credentials have, in fact, been cleared with the Racing Board.

In the event of defendant's termination, dissolution or liquidation, the Racing Law provides that defendant's net assets will be distributed by the governor in accordance with applicable law. N.Y.Racing Law § 202(2). One such provision states that, upon dissolution or voluntary relinquishment of the racing franchise, defendant must transfer all right, title, and interest in its racing facilities to the state's Thorough-bred Racing Capital Investment Fund. N.Y.Racing Law § 208(8).

## DISCUSSION

To obtain a preliminary injunction, the moving party must make a showing of "irreparable injury and either a likelihood of success on the merits, or sufficiently serious questions going to the merits to make them a fair ground of litigation plus a balance of hardships tipping decidedly in his favor." *Patton v. Dole,* 806 F.2d 24, 28 (2d Cir.1986).

With respect to plaintiff's state law claim, plaintiff has failed to meet this standard. Plaintiff's theory under state law, although never clearly articulated, appears to be that defendant cannot arbitrarily exclude plaintiff from or restrict his access to defendant's tracks because plaintiff makes his living covering racing events for his newspaper. Under New York law, however, defendant, as an operator of places of amusement or resort, generally retains the common law authority "to serve whomever" it pleases and exclude patrons "without reason or sufficient excuse." *Jacobson v. New York Racing Ass'n, Inc.,* 33 N.Y.2d 144, 149, 350 N.Y.S.2d 639, 642, 305 N.E.2d 765, 767 (1973); *Saumell v. New York Racing Ass'n, Inc.,* 58 N.Y.2d 231, 238, 460 N.Y.S.2d 763, 766, 447 N.E.2d 706, 709 (1983). This does not mean, however, that defendant can exclude members of the public on grounds, such as race discrimination, proscribed by the New York Civil Rights Law. Defendant also may not arbitrarily exclude persons such as horse trainers who are licensed by the state. *See Saumell,* 58 N.Y.2d at 238, 460 N.Y.S.2d at 763, 447 N.E.2d at 706 ("*Jacobson* held only that a race track proprietor's common-law right to exclude undesirable patrons without reason or excuse, so long as it is not discriminatory, did not extend to persons licensed by the state....").

Plaintiff makes no claim that he is licensed by New York or that defendant restricted his ability to take photographs for any of the impermissible reasons set forth in the Civil Rights Law. Instead, plaintiff appears to argue that, because he

is a journalist who makes his living reporting on racing events and because defendant possesses a virtual monopoly on thoroughbred racing in this state, defendant cannot arbitrarily exclude him from its thoroughbred tracks. This argument lacks merit. In *Presti v. New York Racing Ass'n, Inc.*, 46 A.D.2d 387, 363 N.Y.S.2d 24 (2d Dep't 1975), the Appellate Division rejected plaintiff's argument and upheld defendant's decision to exclude persons with a professional interest in horse racing for any reason at all. The petitioner in *Presti*

"... claims he is a broker in the purchase and sale of thoroughbred racehorses, acting on behalf of purchasers and sellers of thoroughbred racehorses and on occasion on his own account, and that his ability to conduct his business depends upon his access to the appellant's racetracks. He contends further that one of the most critical requirements in conducting his business is to have the opportunity of attending, as a member of the general public, racetracks owned and controlled by the appellant."

*Id.* at 25. Despite the petitioner's claim that his occupation required that he attend races, the court held that petitioner, "as an unlicensed person ..., was clearly subject to [NYRA's] absolute right of exclusion." *Id.* at 27. Because plaintiff in this action has failed to show a likelihood of success on the merits of his state law claim or serious questions with respect thereto, his application for preliminary injunctive relief on state law grounds is denied.

In order to succeed on his claim under § 1983, plaintiff must show at trial that defendant acted under color of state law and caused him to be deprived of a right secured by the first amendment. *See Annunziato v. The Gan, Inc.*, 744 F.2d 244, 250 (2d Cir.1984). Since plaintiff's showing of "irreparable injury" for purposes of the instant application depends to a large extent upon the merits of plaintiff's first amendment claim, consideration is appropriately given first to the issue whether plaintiff has shown a likelihood of success on the merits of the "state action" and first amendment issues.

In order to be subject to suit under § 1983, the alleged infringement of federal rights must be "fairly attributable to the State." *Rendell-Baker v. Kohn*, 457 U.S. 830, 838, 102 S.Ct. 2764, 2770, 73 L.Ed.2d 418 (1982). To demonstrate "fair attribution," the plaintiff must show either that "there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself," *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974), or that the "State has so far insinuated itself into a position of interdependence with [the regulated entity] that it must be recognized as a joint participant in the challenged activity." *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725, 81 S.Ct. 856, 862, 6 L.Ed.2d 45 (1961); *Myron v. Consolidated Rail Corp.*, 752 F.2d 50, 54 (2d Cir. 1985).[3] This latter "symbiotic relationship" test does not require that the plaintiff demonstrate that the state was involved in the challenged conduct. *Myron*, 752 F.2d at 54; *Gerena v. Puerto Rico Legal Services, Inc.*, 697 F.2d 447, 451 (1st Cir.1983); *see also San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.*, (hereafter *"USOC"*), —— U.S. ——, —— n. 29, 107 S.Ct. 2971, 2986 n. 29, 97 L.Ed.2d 427 (1987) (plaintiff must show that the federal government "can *or* does exert any influence over the exercise of the [defendant's challenged] enforcement decisions") (emphasis supplied).

The Court agrees with defendant that plaintiff has failed to show any likelihood of establishing state action under the

---

**3.** Defendant's reliance on *Warren v. Governmental Nat'l Mortgage Ass'n*, 611 F.2d 1229 (8th Cir.), *cert. denied*, 449 U.S. 847, 101 S.Ct. 133, 66 L.Ed.2d 57 (1980), is misplaced. In that case, the court applied the "nexus" test and determined that the defendant's foreclosure action did not constitute government action. The court, however, did not consider whether the defendant was a federal actor under the "symbiotic relationship" test. Under the Second Circuit's decision in *Myron*, this Court must consider whether defendant is a state actor under both the nexus test and the symbiotic relationship test.

"nexus" test. There is nothing in the record which indicates that state officials, for example, participated in the decision to restrict plaintiff's ability to take photographs. Nevertheless, the Court is persuaded, after reviewing the parties' memoranda, affidavits, and depositions, as well as the relevant authorities, that it is likely that plaintiff will establish state action under the symbiotic relationship test at trial.

In *Halpern v. Lomenzo, supra,* 81 Misc.2d at 472, 367 N.Y.S.2d 653, the court determined that under the symbiotic relationship test defendant NYRA's conduct constitutes state action primarily because defendant's "ability to purchase and improve its physical plants and conduct its day-to-day business activity was and is completely dependent upon state action, indeed, upon the benevolence of the Legislature." The court examined the early legislative enactments which authorized tax deferrals and increases in defendant's share of the wagering pool in order to discharge defendant's indebtedness. Justice Stecher concluded:

> "The symbiosis between the State and the NYRA is thus apparent: the New York Racing Association was created under a law whose purpose, in part, was to enable the State to 'derive a reasonable revenue for the support of government' (N.Y. Const, art I, § 9, par 1); indeed the NYRA is substantially the only vehicle through which the State procures revenue from thoroughbred horse racing; and the State's deferral and relinquishment of tax revenues to which the State was and is entitled is the principal source of the NYRA's ability to finance both its capital and operating expenses. The State has so far insinuated itself into a position of interdependence with [the business establishment] that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so "purely private" as to fall without the scope of the Fourteenth Amendment' (*Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 725 [81 S.Ct. 856, 862, 6 L.Ed.2d 45], *supra; see also Cooper v. Aaron,* 358 U.S. 1, 4 [78 S.Ct. 1401, 1403, 3 L.Ed.2d 5 (1958) ] )."

*Id.* at 473, 367 N.Y.S.2d 653.

The interrelationship between the state and defendant is in fact even closer than that described by the court in *Halpern.* In a real sense, defendant is merely a conduit through which money passes from the betting public to the state's coffers. Defendant is a non-profit association which the legislature has prohibited from distributing money to its shareholders. Thus, after defendant covers its expenses, all of defendant's putative "profits" are transferred to the state in the form of a "franchise fee." Viewing defendant as a conduit for state revenues is consistent with the legislature's declared purpose in creating defendant of providing "reasonable revenue for the support of government." N.Y.Racing Law § 208(9)(d)(4).[4] Moreover, by authorizing the creation of defendant, the legislature appears deliberately to have placed the power, prestige, and good name of the state behind defendant in order to assure the betting public that racing and wagering are conducted legitimately. As Judge Weinfeld recognized in the area of harness racing:

> "The owners of the raceways, no less than the state and its official agency, the State Racing Board, have a great stake in maintaining and protecting the sport's integrity against those who would despoil it. The state's interest essentially reflects the public interest that sports be honestly conducted, which extends to the avoidance of even the appearance of impropriety in connection with pari-mutuel betting. The state also has a substantial monetary interest since it receives vast

---

**4.** On this ground, the Second Circuit's decision in *Myron, supra,* that there is no symbiotic relationship between Conrail and the federal government is distinguishable from this case. Although 85% of Conrail's preferred stock is held by the federal government, Conrail never-theless is a corporation that operates in order to obtain a profit for its common and preferred stock shareholders. The "profits" raised by defendant, in contrast, inure exclusively to the state.

sums from the proceeds of racing meets."

*Gilmour v. New York State Racing & Wagering Bd.*, 405 F.Supp. 458, 460 (S.D. N.Y.1975). Thus, in enacting defendant's enabling law, the legislature declared that defendant must utilize its facilities and revenues to establish "thoroughbred racing and pari-mutuel betting on such racing in New York State on such footing that it will command the interest as well as the confidence and favorable opinion of the public." N.Y.Racing Law § 208(9)(d)(4).[5] In keeping with the legislative purpose, it is not surprising that the State Tax Commission maintains a tax office at defendant's tracks in order to audit the pari-mutuel handle. In addition to placing its imprimatur on defendant, the state is entangled with defendant's board of trustees and its property. The Racing Board must approve and may remove defendant's trustees. The state granted the board of trustees the authority to appoint special policemen—a power typically reserved to cities and states. *See Fitzgerald v. Mountain Laurel Racing, Inc.*, 464 F.Supp. 263, 267–68 (W.D.Pa.1979) (holding that racing association's conduct in evicting plaintiff constituted state action under *Jackson v. Metropolitan Edison Co.*'s "nexus" test because, *inter alia*, state conferred on racing association power to employ security personnel with powers and duties of peace officers), *aff'd on other grounds*, 607 F.2d 589, 600 n. 14 (3d Cir.1979) (expressing no opinion on delegation factor). Upon dissolution of defendant, the governor is required to distribute defendant's net assets.

Beyond these factors which the court in *Halpern* did not discuss, the symbiotic relationship between the state and defendant has grown closer since *Halpern* was decided in 1975. For example, in 1977 the Racing Law was amended to require the governor to appoint three members to defendant's 20 member board of trustees. More significantly, in 1983 the legislature created the Thoroughbred Racing Capital Investment Fund, a state agency which loans money to defendant to improve defendant's racing facilities and thereby increase the state's revenues. *See* L.1983 ch. 1007, § 1 (statement of legislative findings and purpose). Since defendant's capitalization is $1,000, it does not pay off the loans it receives from the Fund itself. Rather, the loans are discharged using monies that would, in the absence of capital improvements, go to the state treasury in the form of a franchise fee. Thus, defendant is not only loaned state funds to conduct capital improvements, but the capital improvements are paid for with the state's money. See L.1983, ch. 1007, § 1 (state intends to accomplish objective of improving thoroughbred racing industry through capital fund "by dedicating a portion of the revenues derived from the conducting by [defendant] of high quality thoroughbred racing at such facilities to the financing of capital improvements at such facilities"). Based upon the foregoing factors and authorities, it appears probable that plaintiff will establish state action at trial.

Defendant, in seeking to minimize the significance of *Halpern*, argues that the decision is at odds with the pronouncements of the New York State Court of Appeals on this issue. Defendant's contention is incorrect. In 1973, the Court of Appeals in *Jacobson v. New York State Racing Ass'n, Inc.*, 33 N.Y.2d 144, 150–51, 350 N.Y.S.2d 639, 305 N.E.2d 765, declined to reach the question of whether defendant's conduct qualifies as state action. That decision certainly cannot be read as foreclosing the subsequent decision in *Halpern*. Defendant also contends that the state action portion of the *Halpern* decision is dictum because the court ultimately found that defendant had not engaged in discriminatory conduct. Although the discussion of defendant's symbiotic relationship with the state was not necessary to the outcome of the case, the *Halpern*

---

**5.** The four-justice dissent in *USOC, supra*, —— U.S. at ——, 107 S.Ct. at 2987, indicates the relevance that the legislature's intent of "standing behind" New York racing has in assessing state action. In dissent, Justice Brennan noted that the Olympic Committee was a government actor because Congress placed the power and prestige of the United States Government behind the Committee. *Id.* at ——, 107 S.Ct. at 2992.

court's opinion is nevertheless persuasive. The court, sensibly and at considerable length, discussed the relevant statutory framework, the legislative history, and defendant's financial structure.

Defendant also argues that "courts in other States have refused, without exceptions, to find a 'symbiotic relationship' between private racing associations and State governments." Defendant's Reply Memo. at 9. Defendant's statement is not entirely accurate. In *Puntolillo v. New Hampshire Racing Comm'n*, 390 F.Supp. 231, 236 (D.N.H.1975), the court determined that the activities of the New Hampshire Trotting & Breeding Ass'n, Inc. qualified as state action. The court reasoned:

> "Horse racing is a state monopoly. It appears from the pleadings that the Association conducts the horse racing activities at Rockingham Park in conjunction with the Commission and other state agencies. In addition, an essential by-product of horse racing is the raising of state revenues. I find that the Association plays an integral role in the state monopoly of horse racing and that it acts under color of state law."

*Id.* at 236. Immediately thereafter, the court cited *Burton v. Wilmington Parking Auth.*—the case in which the Supreme Court fashioned the symbiotic relationship test—in support of its position. Moreover, the fact that other courts have not found a symbiotic relationship between racing associations and state governments does nothing more than illustrate that states participate in and regulate thoroughbred racing in a variety of ways. Defendant has made no showing that the state governments in the decisions which found no symbiotic relationship had insinuated themselves into a position of interdependence with the racing associations to the degree that the State of New York has involved itself in defendant's operations. *Cf. Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939, 102 S.Ct. 2744, 2755, 73 L.Ed.2d 482 (1982) (state action inquiry is "necessarily fact-bound").

Further, defendant argues that plaintiff cannot establish state action under the Su-preme Court's recent decision in *USOC, supra*. That case involved the United States Olympic Committee's decision to prohibit the sponsor of the proposed "Gay Olympic Games" from using the word "Olympic," in which Congress had granted the USOC exclusive rights. In a 5–4 decision, the Court determined that the USOC was not a government actor, primarily on the ground that "[t]here [was] no evidence that the Federal Government coerced or encouraged the USOC in the exercise of its [exclusive trademark] right." —— U.S. at ——, 107 S.Ct. at 2986. Under this "nexus" test, the Court did not find it significant that Congress granted the USOC its corporate charter, that Congress granted the USOC exclusive use of the word "Olympic," or that Congress intended to help the USOC obtain funding and made available for the Committee's use $16 million in grants. The Court also noted that neither the President nor the Congress possessed the power to control the USOC's actions. *Id.* n. 27. For these reasons, the Court also rejected the sponsor's argument that the federal government should be viewed as a joint participant with the USOC under *Burton*. The Court stated that the sponsor of the proposed Gay Olympic Games "has failed to demonstrate that the Federal Government can or does exert any influence over the exercise of the USOC's enforcement decisions." *Id.* at —— n. 29, 107 S.Ct. at 2986 n. 29.

*USOC* does not control this case. First, unlike defendant, the USOC does not provide Congress with any monies. Indeed, Congress gave the USOC exclusive use of the word "Olympic" to supply "the USOC with the means to raise money to support the Olympics and encourage[ ] the USOC's activities by ensuring that *it* will receive the benefits of its efforts." —— U.S. at ——, 107 S.Ct. at 2982. In the case *sub judice*, defendant keeps few of the revenues it receives from bettors; indeed, after it covers its expenses, defendant transfers all of its profits to the state. Since Congress, in authorizing the incorporation of the USOC, did not intend to derive revenues for itself, the relationship between Congress and the USOC is not as symbiotic

as the relationship between New York State and defendant NYRA. Second, unlike Congress and the USOC, the state "can" exert influence over defendant's decisions with respect to press credentials. Section 236 of the Racing Law provides that "[t]he issuance of free passes, cards or badges" to "persons actually employed and accredited by the press to attend" horse races "shall be under the rules and regulations of the state [R]acing" Board. It is clear, therefore, that the state can, if it chooses, affect defendant's decisions regarding the issuance of press credentials. Third, nothing in the *USOC* decision indicates that Congress must approve or can remove the USOC's directors. Nor does the decision suggest that the USOC's assets, upon dissolution, must be transferred by a public official to a federal agency. *Cf.* N.Y.Racing Law §§ 202(2), 208(8). In short, the facts in *USOC* are not as suggestive of a symbiotic relationship as are the facts in the instant case.

Having determined that plaintiff has shown a likelihood of establishing state action, the Court must next consider the merits of plaintiff's claim that defendant's conduct deprived him of a right secured by the first amendment.

■ Defendant's restriction on plaintiff, as currently worded, prohibits him from bringing a camera into and taking and being in pictures in the paddock areas of defendant's racing tracks. Defendant acknowledges that this restriction applies to no other member of the press and that other press representatives are accorded access to the paddock area of defendant's tracks to take photographs. When some members of the press are given access to cover an event, the state cannot arbitrarily impose limits on other press representatives' access to the news. *ABC v. Cuomo*, 570 F.2d 1080, 1083 (2d Cir.1977); *D'Amario v. Providence Civic Center Auth.*, 639 F.Supp. 1538, 1542 (D.R.I.1986). Thus, the first amendment prohibits government from restricting a journalist's access to areas otherwise open to the press based upon the content of the journalist's publications. *Sherrill v. Knight*, 569 F.2d 124, 129 (D.C.

Cir.1977); *cf. New York City Unemployed & Welfare Council v. Brezenoff*, 677 F.2d 232 (2d Cir.1982) ("restrictions based on the content of communication are especially disfavored"). Moreover, even if a restriction which affords different degrees of access to members of the press is not content-based, the limitation must "serve a legitimate governmental purpose, must be rationally related to the accomplishment of that purpose, and must outweigh the systemic benefits inherent in unrestricted (or lesser-restricted) access." *D'Amario v. Providence Civic Center Auth.*, supra, 639 F.Supp. at 1543. *See also WPIX, Inc. v. League of Women Voters*, 595 F.Supp. 1484, 1489 (S.D.N.Y.1984) ("WPIX's right to equal access under the first amendment is not absolute, however, and the interests to be served by the news-gathering activity at issue must be balanced against the interest served by denial of that activity.").

■ After reviewing the affidavits and deposition testimony submitted in this matter, the undersigned is persuaded that plaintiff is likely to demonstrate at trial that defendant deprived him of his right to equal access under the first amendment. First of all, it is probable that plaintiff can show that defendant's restriction is content-based. In his affidavits, plaintiff alleged that he was told "off the record" that the restriction was imposed because defendant's officials felt that his coverage made him appear bigger than defendant's events. The deposition of Mr. Schwartz provides substantial corroboration for plaintiff's statement. Mr. Schwartz testified that his decision to deny plaintiff a credential in the first instance was based in part on the fact that plaintiff's newspaper coverage makes him appear bigger than defendant's events. Mr. Schwartz, it would appear, acted based on disapproval of the contents of *Post Time USA*.

The conclusion that defendant's decision was content-based is bolstered by the fact that defendant's explanation that the limitation was imposed because of plaintiff's conduct appears pretextual. Prior to the July 9, 1987 depositions, defendant contended that the restriction was imposed

because plaintiff's activities were "interfering with [the paddock's] normal activities" and "unreasonab[ly] annoy[ing] those who participate in and/or who attend races at [defendant's] tracks." Schwartz Aff. ¶ 17; Lieberman Letter dated May 8, 1987. Indeed prior to discovery, defendant's memorandum of law expressed the rationale for imposing the restriction as follows:

"Mr. Stevens' bizarre conduct in the NYRA paddock generated complaints and protests to NYRA from horsemen who objected to the disruption and annoyance he was introducing into their immediate pre-race activities. It became apparent that Mr. Stevens' pursuit of self-staged 'photo opportunities' was directly contradicting the objective of NYRA's press relations program by generating, not good will for NYRA, but ill will among a constituency important to the success of its business. This was a unique experience for NYRA. Never before had it received complaints from patrons or horsemen that a press credential holder was annoying them."

The deposition testimony exposes the inaccuracy of defendant's prior statements. It demonstrates that no horse owner, trainer, or jockey ever complained to defendant about plaintiff's activities and that plaintiff's photography has not interfered with any horseman's pre-race activities. It also shows that neither Mr. McKeon nor Mr. Schwartz, either directly or through one of defendant's other officials, has ever received a complaint about plaintiff from a patron. The inconsistencies between the statements of defendant's executives make its position that the restriction was imposed due to plaintiff's "disruptive" conduct less than believable.

Moreover, the conduct and comments on which the restriction is allegedly based are innocuous. While plaintiff "collared" Mr. McKeon into a picture on one occasion, there is no indication that plaintiff used force or otherwise acted improperly in requesting that a picture be taken. Indeed, Mr. McKeon testified that plaintiff has always comported himself as a gentlemen and that plaintiff did nothing more than lead Mr. McKeon into a posed photograph.

The character of the comments of other NYRA officials on which Messrs. McKeon and Schwartz allegedly relied—that plaintiff's actions are not those of a normal reporter, for example—does not suggest that plaintiff's activities are disruptive, especially since neither NYRA official has ever passed on a complaint from a patron or a participant to Mr. McKeon or Mr. Schwartz. Similarly, plaintiff's conduct at Churchill Downs in Kentucky cannot be characterized as disruptive. To be sure, plaintiff stood behind the ABC television representative during the paddock scenes at the 1984 Kentucky Derby. So too, however, did a number of other people. Indeed, while other paddock patrons smiled and waved at the camera, plaintiff largely stood still and did not engage in such antics. The evidence of misconduct which defendant's executives received from other race track officials appears quite slender.

The foregoing testimony and inconsistencies, along with the fact that defendant has singled out plaintiff and imposed a restriction on him that is not applicable to other press representatives, persuade the Court that plaintiff will likely prove at trial that defendant's restriction is content-based.

■ Even assuming, however, that defendant's restriction is not content-based, it is likely that plaintiff will demonstrate that the restriction violates his rights to equal access under the first amendment. In order to invalidate a content-neutral restriction on press access, plaintiff must demonstrate that the restriction does not serve a legitimate government objective or that the benefits derived from the restriction are fewer than the harm that it causes.

Defendant, of course, has an interest in promoting and conducting thoroughbred racing. Furthering this interest reasonably requires that defendant institute measures which limit conduct that annoys the patrons of and participants in defendant's racing events and interferes with the activities involved in putting on such races. Conduct that disrupts and interferes may ultimately result in a loss of revenues from pari-mutuel wagering.

While these objectives are clearly legitimate, there is no evidence which suggests that defendant's restriction on plaintiff serves these interests. As noted above, the depositions indicate that no patron or horseman has ever complained to defendant's officials about plaintiff's activities. Moreover, nothing in the record before the Court suggests that plaintiff's activities have interfered with the normal activities carried on in the paddock—that is, the saddling and mounting of the horses; the strategy sessions among owner, trainer, and jockey; and the parading of the horses before the racing public. Indeed, the evidence demonstrates only that officials of defendant, rather than patrons and horsemen upon whom defendant and the state rely for racing revenues, object to plaintiff's picture-taking in the paddock. These facts not only demonstrate that the restriction does not actually serve legitimate state interests, but they also show that the benefits of the limitation are outweighed by the costs it imposes. Because plaintiff's activities are not annoying to patrons or participants, defendant will reap few benefits from the limitation. Plaintiff and his readers, however, will likely be hurt by the restriction, since the limitation disables plaintiff from photographing subjects in an area of defendant's tracks that is frequented by horsemen and racing personalities. The parties do not dispute that plaintiff's newspaper focuses on the "racing social scene." Plaintiff alleges that photographs of racing personalities are important to maintaining readership interest and securing advertising revenues and that access to all parts of a racing track is needed to obtain these pictures. The copies of plaintiff's newspaper which plaintiff submitted to the Court appear to corroborate these allegations. Each paper contains at least 10 "photo pages." Each of these pages, in turn, contains some 10 or 20 photographs of racing and other personalities at various racing events. These photographs, many of which are posed with plaintiff, are taken both indoors and outdoors at different locations around the racing tracks. It is reasonable to infer that, because of the restriction imposed by defendant, some pictures which would otherwise appear in *Post Time USA*'s photo pages will not be taken. On balance, the costs of the restriction in terms of loss of editorial freedom and newsgathering, as well as a possible reduction in the readership's enjoyment, outweigh any benefits which defendant can be expected to derive from the restriction.

Beyond satisfying Rule 65's requirements with respect to the merits of his § 1983 claim, plaintiff has also made the necessary showing of irreparable harm. It is well settled that the loss of first amendment freedom, even for minimal periods of time, constitutes irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976); *Lydo Enter., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1214 (9th Cir.1984); *Deerfield Medical Center v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. Unit B 1981). As discussed above, plaintiff has demonstrated that he is likely to succeed at trial on the merits of his first amendment claim. As a result, plaintiff has also made a sufficient showing of irreparable injury to satisfy Rule 65.

For the foregoing reasons, defendant is enjoined pending trial from prohibiting plaintiff or an accompanying photographer from carrying a camera into the paddock areas at defendant's racing tracks and taking or being in pictures in such areas unless, of course, plaintiff's conduct in the paddock area unreasonably annoys patrons or participants or interferes with the business conducted in the paddock.

### Summary Judgment

With respect to plaintiff's § 1983 claim, defendant's request for summary judgment is denied. As indicated above, there are disputed issues of fact with respect to both the state action and the first amendment questions.

With respect to plaintiff's state law claim, however, defendant's motion is granted. The New York Court of Appeals' decisions in *Jacobson* and *Saumell, supra*, and the Appellate Division's decision in *Presti, supra*, hold that, as a matter of state law, defendant may choose not to

serve persons at its racing tracks for any reason or no reason at all unless the person is a state licensee or the decision not to serve is based upon some impermissible ground set forth in New York's Civil Rights Law. To the extent that defendant can arbitrarily exclude plaintiff from its tracks altogether, *a fortiori* it may condition his admission to the paddocks of its tracks on plaintiff's not carrying a camera into those areas.

The Racing Board's regulations are not to the contrary. Section 236 of the Racing Law directs that the Racing Board regulate defendant's issuance of free passes to the press. The Racing Board, in turn, requires that defendant "implement and maintain an identification system for all persons entering ... the backstretch and paddock areas." 9 NYCRR § 4003.50(a). The regulation says nothing, however, about the bases upon which defendant may issue or deny credentials to the press.

Plaintiff argues that defendant's motion for summary judgment should be denied because he has not had an opportunity to conduct discovery. It is well established, however, that a court may grant summary judgment despite a party's request for discovery where the party does not set forth the facts that could be developed through discovery. *Taylor v. Gallagher,* 737 F.2d 134, 137 (1st Cir.1984); *Taylor v. Sentry life Ins. Co.,* 729 F.2d 652, 656 (9th Cir. 1984). Plaintiff does not identify any relevant facts that discovery can be expected to develop on his state law claim. There is no indication that discovery will reveal that plaintiff is a state licensee or that defendant imposed the photography restriction based upon any grounds identified in the Civil Rights Law.

Indeed, plaintiff has failed to cite any authority which suggests that he has a cause of action under New York law. Accordingly, defendant's request for summary judgment on plaintiff's claim under state law is granted.

For the reasons stated above, plaintiff's application for a preliminary injunction is granted. Defendant's motion for summary

judgment is denied, except as to plaintiff's state law claim.

The Clerk is directed to mail a copy of the within to all parties.

SO ORDERED.