**PHONE PROGRAMS ILLINOIS, INC., and Joseph Mezzone, Plaintiffs,**

**v.**

**NATIONAL JOCKEY CLUB, INC., d/b/a Sportman's Park Race Track, Balmoral Park Race Track, Maywood Park Race Track, William Johnston, Jr., Race Track Corp. and Maywood Park Trotting Association, Defendants.**

**No. 88 C 1698.**

United States District Court, N.D. Illinois, E.D.

Aug. 2, 1988.

Michael R. Levinson, Mark A. Orloff, Alexander, Unikel, Zalewa & Tenenbaum, Chicago, Ill., for plaintiffs.

Timothy J. Riordan, Diane Stern Smith, Defrees & Fiske, Thomas D. Nash, George S. Lalich, Nash & Lalich, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Plaintiffs Phone Programs Illinois, Inc. ("Phone Programs") and Joe Mezzone bring this action against the operators of various horse racing parks ("Parks") charging breach of contract and civil rights and antitrust violations arising out of the Parks' refusal to grant plaintiffs access and press credentials. Defendants have filed motions to dismiss which, for the reasons set forth below, we grant in part and deny in part.

### Factual Background [1]

Phone Programs provides pre-recorded reports over the telephone covering, among other things, the weather forecast, state lottery results, stock prices and sporting event results including local college and professional teams and harness and thoroughbred horse racing results at various local tracks. The defendants own or operate three tracks—Sportsman's Park, Balmoral Park and Maywood Park—licensed by the Illinois Racing Board ("Board") pursuant to the Illinois Horse Racing Act of 1975, Ill.Rev.Stat. ch. 8, ¶ 37–1 et seq. Thousands of individuals attend the tracks daily, and Chicago newspapers and radio and television stations regularly report race results at those tracks as well as race forecasts and betting odds.

The Board extensively regulates the Parks. Plaintiffs allege generally that Illinois, through the Board, "has a substantial involvement in and control over the ownership, management, policies, practices and operation" of the Parks. Under the Racing Act, the Board is empowered to supervise race meetings and racing organizations, and in exercising that power, the Board has promulgated the Rules and Regulations of Harness Racing ("Racing Rules") that meticulously define the standards of race track operations. Certain of the statutory provisions and administrative rules and regulations are pertinent to the motions here. The Parks must provide adequate security personnel to maintain order in the Parks, and such personnel must submit daily reports detailing criminal conduct and ejections. The Parks are granted the right to exclude "those individuals whose presence may 'call into question the honesty and integrity of horse racing or interfere with the orderly conduct of horse racing.'" The Board determines who may own financial interests in the Parks and how betting winnings are apportioned. Illinois receives revenues from the Parks in varying amounts, ranging from 1.75 to 7.75 percent of the daily handles. The state licenses park concessionaires. Finally, the Board establishes when track telephones and telegraph wires may be used.

Phone Programs was granted press credentials to the three Parks and had an express contract with Maywood and Balmoral Parks under which the Parks granted Phone Programs reporters access to press facilities. The Parks then contracted with Conor Communications for exclusive rights to provide to the public certain forms of racing results by telephone. On February 23, 1988, Maywood and Balmoral denied Phone Programs reporters access to their press facilities and required them to view the races as members of the public and phone race results into Phone Programs on non-track public phones. On February 25, Sportman's physically barred Mezzone, a Phone Programs reporter, from entering

---

1. Plaintiffs' Second Amended Complaint sets forth the following allegations of fact which we take as true only for purposes of this motion to dismiss. *Meriwether v. Faulkner*, 821 F.2d 408, 410 (7th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 311, 98 L.Ed.2d 269 (1987).

the Park. Security personnel told him that he was barred from the Park, and that the Park would file criminal trespass charges against him if he returned. Plaintiffs believe Maywood and Balmoral will similarly deny its reporters any access to the Parks.

On Februry 26, 1988, plaintiffs filed this action seeking compensatory, declaratory and injunctive relief. In their Second Amended Complaint, plaintiffs set forth three counts under 42 U.S.C. § 1983 charging violations of their rights to freedom of expression and the press, procedural due process and equal protection, three corresponding conspiracy counts under 42 U.S.C. § 1985(3), a pendent state law claim for breach of contract, three counts charging violations of §§ 1 and 2 of the Sherman Act and one count charging a violation of the Clayton Act. Defendants move under Fed. R.Civ.P. 12(b)(6) to dismiss all but the breach of contract and Clayton Act claims. They contend that plaintiffs have failed to allege state action in the civil rights claims or class-based discriminatory intent in the conspiracy claims, and that the Sherman Act claims fall short on various grounds. We dismiss the § 1983 and § 1985(3) claims but not the Sherman Act claims.

### State Action

The principle of state action is founded on the well-settled proposition that the Fourteenth Amendment proscribes conduct by the state, not private persons. *Civil Rights Cases*, 109 U.S. 3, 11, 3 S.Ct. 18, 21, 27 L.Ed. 835 (1883). Generally, state action is found when the action challenged on constitutional grounds is "fairly attributable to the state." *Rendell–Baker v. Kohn*, 457 U.S. 830, 838, 102 S.Ct. 2764, 2769, 73 L.Ed.2d 418 (1982).[2] In a number of cases, the Supreme Court has addressed state action in contexts in which the actor is not by title or charter an official or agency of the state and has recognized that the determination is necessarily fact-bound: "Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its

true significance." *Burton v. Wilmington Park Authority*, 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961). Before determining whether the actions by the Parks constitute state action, we turn to these Supreme Court decisions for some guidance.

In *Burton,* the first significant case expressly addressing state action, the Court held that the state acted for purposes of the Equal Protection Clause when a privately-owned restaurant located in a public parking facility refused to serve an individual on account of his race. Central to the Court's holding were the facts that the state owned the building and the land on which it stood, the building was predominantly dedicated to public use, and the operations of the restaurant and parking facility were so entwined that each conferred financial benefits on the other. That the state did not order or condone the alleged equal protection violation, that the only direct financial connection with the state consisted of rental payments and that only fifteen percent of the total cost of building the restaurant were advanced from public funds did not render the action private. The Court concluded, in what has become the formulation for the "symbiotic relationship" test, that the "state has so far insinuated itself into a position of interdependence with [the restaurant] that it must be recognized as a joint participant in the challenged activity." *Id.* at 725, 81 S.Ct. at 862.

In *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), the next major state action decision, the Court held that the Moose Lodge's refusal to serve food or alcoholic beverages to an individual on account of his race did not constitute state action even though the state issued a license to serve liquor. Again, the state did not order or authorize the racial discrimination: the licensing regulations "cannot be said to in any way foster or encourage racial discrimination [or] make the State in any realistic sense a partner or even a joint venturer in the

---

**2.** In a § 1983 action, courts apply the state action framework to determine whether plaintiffs have been deprived of a "right secured by the

Constitution and the laws of the United States." *Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 156, 98 S.Ct. 1729, 1733, 56 L.Ed.2d 185 (1978).

club's enterprise." *Id.* at 176–77, 92 S.Ct. at 1973. The Court distinguished *Burton* on the facts that the building and land were privately owned, and the Lodge did not hold itself out as open to the public. Further, the Court introduced the "public function" factor, finding that the Lodge by serving liquor was not discharging a function that the state usually performs. *Id.* at 175, 92 S.Ct. at 1972.

In 1974, the Court attempted to construct a workable framework for state action determinations. In *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), the Court held that an electric utility company, in exercising its authority to terminate electric service without notice or a prior hearing, is not a state actor subject to the Fourteenth Amendment despite the facts that the state heavily regulated the utility, granted the company monopoly status and expressly authorized and approved the termination practice. First the Court found that there was not "a sufficiently close nexus between the state and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the state itself." *Id.* at 351, 95 S.Ct. at 449. Even though the state authorized and approved the practice of terminating benefits without procedural protections, it did not require the utility to obtain that authorization or, more significantly, to implement that practice. The Court also found that furnishing electricity is not a public function normally performed by the state. Finally, the Court found no symbiotic relationship between the utility and the state since the facilities and land were privately owned and taxes provided the only direct financial benefit to the state.

Finally, in a pair of 1982 cases, the Court refined what have become the dual state action tests: the "nexus" and "symbiotic relationship" tests. In *Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), plaintiffs charged that the discharge and transfer of patients in a privately-owned nursing home without the procedural protections of the Fourteenth Amendment violated their civil rights. The Court found no state action. Extensive state regulations, as in *Jackson,* did not establish a symbiotic relationship between the nursing home and the state such that any actions by the homes could be attributed to the state. A specific regulation that required the homes to explain all discharge and transfer decisions to a state agency did not constitute a sufficient nexus between the state and the practices of the home:

> [A] State normally can be held responsible for a private decision only when it has exercised coercive power or has provided some significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the state. Mere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible. *Id.* at 1004, 102 S.Ct. at 2786.

In *Rendell–Baker, supra,* various employees charged a nonprofit private school for maladjusted students with discharging them in retaliation for the exercise of First Amendment rights and without the procedural protections of the Fourteenth Amendment. The Court held that the school was not subject to the Fourteenth Amendment despite heavy state regulation and the facts that the vast majority of the school's students are government-referred and funded and that public funds account for over ninety percent of the school's budget. The state did not compel, influence or in any way profit from the discharge decisions. Finally, while the education of these students is a public function, it is not within the "exclusive province of the State." *Id.* 457 U.S. at 842, 102 S.Ct. at 2772.

With these concededly fact-specific Supreme Court decisions, we must examine whether plaintiffs here have alleged facts upon which a trier of fact can find that defendants' denial of press credentials and park access were acts done under color of state law.

■ The general allegation of substantial involvement in and control over park operations is a conclusory allegation that, without factual support, is insufficient to withstand the motion to dismiss. *See, e.g., Vandenplas v. Muskego,* 753 F.2d 555, 560

(7th Cir.), *cert. denied,* 472 U.S. 1018, 105 S.Ct. 3481, 87 L.Ed.2d 616 (1985). Plaintiffs allege the following facts to support a finding of state action: The Parks are extensively regulated and taxed, the Board requires the Parks to hire security personnel and gives them the right to exclude individuals, the Board requires security personnel to regularly submit reports, the personnel threatened reporters with criminal prosecution and the Board determines when Park telephones must be nonoperational.

■ Plaintiffs seek to establish a nexus between the state and the decision to exclude reporters and the actions of security personnel in carrying out that decision. Neither is supported by sufficient allegations. The Parks barred the reporters on their own decision, not as the result of any rule or regulation mandating who may or may not receive access or press credentials. There is no allegation that any state official ordered or encouraged the Parks to exclude Phone Programs or any other reporters. That the state allows the Parks to exclude individuals "whose presence may interfere with the orderly conduct of horse racing" does not in any way warrant a finding that the state coerced the Parks to bar Phone Programs reporters or to bar individuals in violation of their First Amendment rights. As the Court made clear in *Jackson,* the state's providing a private actor with certain discretion does not convert every exercise of that discretion into state action. 419 U.S. at 357, 95 S.Ct. at 456. Similarly, we cannot attribute to the state the Parks' decision to deny plaintiffs use of Park phones on the mere basis that the state has determined that all park telephones may not be used during races.

As to the actions of security personnel in barring (or threatening to bar) Phone Pro-

grams reporters, the personnel were hired by the Parks and are not trained or paid by the state. No state official or police officer participated in the reporters' exclusion. As in *Blum,* the state's requiring the Parks to regularly file security reports indicating, *inter alia,* whom the private security personnel excluded from the facilities does not warrant attributing every exclusion to the state in the absence of any allegation that the state ordered, encouraged or participated in either the decision or the act.[3] Acquiescense presumed by the state's inaction does not constitute state action unless the state had an affirmative duty to act. *Citizens Council on Human Relations v. Buffalo Yacht Club,* 438 F.Supp. 316, 323 (W.D.N.Y.1977). Finally, the security personnel's threats of criminal prosecution are irrelevant. Plaintiffs have not alleged that state officials made such threats or that the personnel had any power to initiate prosecutions beyond any private citizen's power to file charges against another private citizen. A threat by a private actor to invoke the power of the state is not necessarily an action of the state.

■ Plaintiffs have failed to allege sufficient facts to support a finding of a symbiotic relationship between the Parks and the state. At most, plaintiffs have alleged that the state regulates in great detail virtually every aspect of Park ownership and operation. *Jackson, Blum* and *Rendell–Baker* make clear that a finding of state action cannot hinge on that fact alone. As in *Moose Lodge,* the facilities and land here are privately owned, and there is no allegation that the state expended funds to maintain or operate the Parks. The Parks must pay various fees as well as taxes of 1% of the pari-mutuel handle to each of the municipality and county, 1% to a Tax Allocation Fund and a privilege tax of up to 7.75% to the state. Ill.Rev.Stat. ch. 8, ¶¶ 37–26, 37–28.[4] As *Jackson* makes clear,

---

**3.** Our finding that state action is absent in the Park security personnel's acts is limited to the situation in which the allegations at most demonstrate that private security personnel acted pursuant to a state-granted right to exclude members of the public that the private race track owner deems inimical to the integrity of its operations. There may very well be state

action if, unlike here, security personnel acted in concert with state officials or pursuant to state-granted law enforcement powers such as the power to arrest for violations of state law.

**4.** Plaintiffs have made no allegation in their complaint to support their contention in their

the payment of taxes by the Parks is insufficient to attribute all actions of the Parks to the state, lest the activities of all private individuals and corporations be attributed to the state.

The handful of decisions addressing state action in the context of private race tracks, while of limited assistance since this analysis is so factbound, nevertheless support our decision. In *Fulton v. Hecht*, 545 F.2d 540 (5th Cir.), *cert. denied*, 430 U.S. 984, 97 S.Ct. 1682, 52 L.Ed.2d 379 (1977), the Fifth Circuit found no state action in a greyhound race track's refusal to renew a contract to race dogs despite the facts that the state licenses the track, grants it monopoly status part of the year, audits its books, extensively regulates its operations and shares track revenues. The track owned the land and assumed all maintenance responsibilities. The state had no control over the track's contract decisions, and the state did not directly or indirectly participate in the particular decision. In *Fitzgerald v. Mountain Laurel Racing, Inc.*, 607 F.2d 589 (3d Cir.1979), *cert. denied*, 446 U.S. 956, 100 S.Ct. 2927, 64 L.Ed.2d 814 (1980), the Third Circuit held that licensing, heavy regulation, substantial tax revenues and that the state approves all officers and shareholders were insufficient to establish a symbiotic relationship between the state and a horse racing association. The Court nevertheless found a nexus between the state and the association's decision to expel the plaintiff based on the participation in that decision of individuals acting in an official capacity for the state. *Id.* at 598–99. Plaintiffs have not alleged such participation here by any state official.

Plaintiffs rely heavily on three decisions involving horse racing tracks in which the courts found state action. In each, however, the plaintiffs pled or proved facts not alleged here. In *Stevens v. New York Racing Association, Inc.*, 665 F.Supp. 164 (E.D.N.Y.1987), the district court found a symbiotic relationship primarily from the fact that all of the defendant-racing association's profits go directly to the state: "In a real sense, defendant is merely a conduit

through which money passes from the betting public to the state's coffers." *Id.* at 172. Further, the state funded capital improvements in the Park and appointed three members to the defendants' board of trustees. Here, the state receives only a portion of the Parks' daily handle, and there is no allegation that members of the Parks Board are state-appointed. In *American Broadcasting Companies, Inc. v. Cuomo*, 570 F.2d 1080 (2d Cir.1977), central to the court's finding state action in the arrest of members of the press for trespass in primary candidates' campaign facilities were the public nature of party primaries and evidence that the Police Commissioner and his agents might have participated in the arrests. Again, plaintiffs have not alleged the actual or possible involvement of state officials in the Parks' decisions or actions. Finally, *Puntolillo v. New Hampshire Racing Commission*, 390 F.Supp. 231 (D.N.H.1975), does not help plaintiffs because the court did not provide any detailed factual basis for its finding of state action, and the few facts upon which it relied—monopoly status, extensive regulation and the receipt of revenues by the state—cannot in our judgment support such a finding.

### Civil Rights Conspiracy Claims

Defendants contend, and plaintiffs do not dispute, that plaintiffs' failure to allege that racial animus motivated defendants' actions warrants dismissal of the § 1985(3) claims. We agree. *See Grimes v. Smith*, 776 F.2d 1359, 1366 (7th Cir. 1985). On that basis, and for plaintiffs' failure to satisfactorily plead state action, *see United Brotherhood of Carpenters and Joiners v. Scott*, 463 U.S. 825, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983), we dismiss the civil rights conspiracy counts.

### Sherman Act Claims

Plaintiffs' Sherman Act claims charge unlawful restraint of trade under 15 U.S.C. § 1 and attempting and conspiring to monopolize the Chicago area market in telephone horse racing results in violation of 15 U.S.C. § 2. Defendants challenge the

---

brief in opposition to dismissal that the state

obtains "the bulk of defendants' income."

sufficiency of all three claims on the grounds that plaintiffs fail to allege essential elements of their claims or set forth conclusory allegations without factual support. We conclude that plaintiffs have satisfactorily pled the Sherman Act claims.

We will liberally construe pleadings in an antitrust action and will not demand unnecessarily strict requirements of pleading as long as the plaintiff adequately puts the defendants on notice of the charged violations. *Austin v. House of Vision, Inc.*, 404 F.2d 401, 403–04 (7th Cir.1968); *Penn Galvanizing Co. v. Lukens Steel Co.*, 65 F.R.D. 80, 81 (E.D.Pa.1974). To state a claim for relief under § 1 of the Sherman Act, plaintiffs must allege facts establishing the existence of a contract, combination or conspiracy in restraint of trade that either has anticompetitive effects or constitutes a *per se* violation in which such effects are presumed. *Havoco of America, Ltd. v. Shell Oil Co.*, 626 F.2d 549, 554–55 (7th Cir.1980). The plaintiffs must further allege that the actions were conducted in or substantially affected interstate commerce. *Seglin v. Esau*, 769 F.2d 1274 (7th Cir.1985).

Plaintiffs have pled sufficient facts which, if found to be true, support each of these elements. A conspiracy may be inferred from the facts that Bidwell, an owner of both Maywood and Balmoral, denied Phone Programs reporters access to the Parks' press facilities, that at or about the same time Sportsman's denied the reporters access, that Maywood and Balmoral intend to deny any access to the Parks, and that all three made an exclusive arrangement with Conor Communications. Plaintiffs allege that consumers of phone results will have less selection of alternative services as Conor Communications becomes the exclusive company able to provide results shortly after the races. Plaintiffs allege that these Parks have exclusive control over the results of horse races at their

Parks,[5] and their refusal as a group to provide Phone Programs access to that information constitutes a group boycott which is *per se* anticompetitive. *Fishman v. Estate of Wirtz*, 807 F.2d 520, 541 (7th Cir.1986). Finally, plaintiffs have alleged interstate commerce implications with the allegation that people in Wisconsin and Indiana use the phone services.

[6] To state a claim of attempted monopolization under § 2 of the Sherman Act, plaintiffs must allege (1) defendants' intent to monopolize (2) a relevant market or submarket (3) by conduct (4) creating a dangerous probability of success. *California Computer Products, Inc. v. International Business Machines Corp.*, 613 F.2d 727, 729 (9th Cir.1979). Plaintiffs have satisfactorily pled these elements. Specific intent may be inferred from the alleged actions of Bidwell and the Parks in dealing exclusively with Conor and in excluding or threatening to exclude plaintiffs from access to the press facilities and the Parks. Plaintiffs have clearly defined the market as the Chicago area market for timely phone racing results from area race tracks. Also, the allegations of an arrangement with Conor to the exclusion of all competitors may support a finding of a dangerous probability of monopolization and, in any event, this requirement is a matter of proof rather than detailed pleading. *General Electric Co. v. Bucyrus–Erie Co.*, 563 F.Supp. 970, 977 (S.D.N.Y.1983).

Finally, to state a claim for conspiracy to monopolize under § 2, plaintiffs must allege a conspiracy to monopolize a market, an accompanying intent to monopolize, overt acts in furtherance of the conspiracy and an appreciable effect on interstate commerce. *United States v. Yellow Cab Co.*, 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947). As in the other Sherman Act claims, plaintiffs have alleged sufficient facts from which the trier of fact

---

**5.** Defendants contend that plaintiffs' complaint is deficient since they did not and cannot allege the absence of alternative sources of race results, such as television, radio and local newspapers. A trier of fact could reasonably infer from the complaint that plaintiffs' claim is

founded not on the denial of any access to that information but on the denial of *immediate* access to racing results and therefore an inability to compete with phone services that provide the most up-to-date information.

may infer a conspiracy, an intent to monopolize and implications to interstate commerce. The overt acts in furtherance of the conspiracy include the exclusive deal with Conor and the exclusion of plaintiffs from the Parks.

 Defendants contend generally that plaintiffs cannot seek relief under the Sherman Act because the Parks own the immediate race results ("stretch calls") and the antitrust laws do not provide an avenue for one company to obtain the property of another without compensation. This contention constitutes a defense to plaintiffs' antitrust claims and, while possibly fatal to ultimate relief, is no basis for dismissing the claims. Further, plaintiffs may be able to demonstrate that the press facilities or Park phones constitute an "essential facility," the denial of which threatens competition or promotes monopolization in the phone race results market. *See, e.g. Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973); *MCI Communications Corp. v. American Tel. & Tel. Co.*, 708 F.2d 1081 (7th Cir.), *cert. denied*, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983).

### Conclusion

Plaintiffs have failed to allege sufficient facts to support a finding of state action. Accordingly, the civil rights claims (Counts I through VI) are dismissed. The civil rights conspiracy claims (Counts II, IV and VI) are dismissed also for failure to allege racial animus. Defendants' motions to dismiss the Sherman Act claims (Counts VII, IX and X) are denied. Defendants are to answer those counts within twenty days. It is so ordered.