OPINION OF THE COURT
Eli Wager, J.
The Vanderbilt Museum, petitioner in this article 78 proceeding, seeks an order removing the proceeding to the Surrogate’s Court, and the respondent American Association of Museums cross-moves for an order dismissing the petition upon the grounds that the court lacks in personam and subject matter jurisdiction, that the petition is untimely, and that the petition fails to state a cause of action. The respondent has also moved for a preanswer “final judgment” with respect to which both parties have submit *503 ted affidavits, exhibits and memoranda of law. The facts follow.
FACTS
The Vanderbilt Museum is an educational corporation chartered by the New York State Board of Regents on July 15,1949. In August, 1949 it received power to administer a trust created under the last will and testament of the late William K. Vanderbilt. The will provided for conveyance to either the State, county or Town of Huntington of certain real and personal property located in Centerport, New York, at such time as the testator’s wife should cease to use the premises as a residence, to be used as a public park and museum “and as such be devoted in perpetuity to the use, education and enjoyment of the public”. The will also provided for an initial maintenance fund of $2,000,000. The gift was accepted by Suffolk County, the property conveyed by the trustees of the Vanderbilt estate, and museum trustees were appointed by resolution of the county legislature in accordance with provisions of the charter. In 1975 a dispute between the museum trustees and the county led to a stipulation and judgment of settlement (in 1979) which delineated their respective powers, e.g., the county was stated to be the sole and exclusive owner of the real and personal property of the museum including the principal and interest of trust funds, but the use, occupancy, control and disposition of all such funds except the principal was stated to be in the museum trustees and all income from trust funds and from museum activities was to be paid over to them. The museum trustees were directed to adopt an annual budget and to file copies with the county executive and legislature, and the Comptroller of Suffolk County was authorized to examine the trustees’ books and records at any time. The stipulation empowered the trustees to hire employees and provided for staggered terms for the trustees themselves and that not more than a majority of them “shall belong to the same political party.”
On October 10, 1980 the accreditation which had been granted to the museum by the respondent American Association of Museums (the Association) in 1971 was “suspended” by the Association commission, although the rec *504 ommendation of the Association’s “Visiting Committee” had been that “accreditation be tabled for one year.” By letter dated December 9, 1980 the museum’s appeal to the commission was denied. Subsequently (according to the affidavit of an Assistant County Attorney submitted as an exhibit here by the petitioner), the county executive ordered an investigation into the loss of accreditation and an audit as provided for in the stipulation of settlement. The trustees immediately commenced the instant article 78 proceeding and two proceedings in the Surrogate’s Court.
The article 78 petition alleges that representatives of the respondent Association, which it is asserted “purports” to exercise the right to evaluate museums doing business in the State of New York, “visited, inspected and reviewed the operations of the petitioner within the County of Suffolk and State of New York as part of said purported reaccreditation process,” that it “purported to suspend the accreditation of petitioner pursuant to the standards and policies set forth in Exhibit A” (the Association’s published Professional Standards for Museum Accreditation) and subsequently denied petitioner’s appeal. The respondent is alleged to have “failed to perform a duty enjoined upon it by law,” to have “proceeded without and in excess of jurisdiction” and the determination is alleged to have been in violation of lawful procedure, arbitrary and capricious and an abuse of discretion and not on the entire record supported by substantial evidence. In its memorandum of law petitioner alleges that the Association violated its due process rights and exceeded its own jurisdiction when it suspended the museum’s accreditation without prior notice or a hearing and without affording it six months within which to cure defects as allegedly required by the Association’s accreditation procedures.
In the Surrogate’s Court the museum trustees seek to judicially settle an account of their acts and to compel the County of Suffolk to account for its administration of the maintenance fund. Cited as persons having or claiming an interest in the proceedings, in addition to the Attorney-General, the State Eduction Department and the county, is the Association (which is cited not as a statutory or necessary party but as one whose action may have significantly *505 prejudiced the museum’s ability to obtain financial grants). It is alleged in the petition for a compulsory accounting that the County of Suffolk has not filed any account as fiduciary and that it “appears that the substantial trust fund estimated to be $9,500,000 in value, may not be bringing an appropriate return, considering current market conditions.” In the petition for a voluntary accounting the trustees allege that “[vjarious questions have been raised publicly to the detriment of the trust by persons acting by or on behalf of the respondents as to (a) whether the petitioners are properly administering and using the property or income of this trust; (b) whether the Last Will and Testament of the deceased is being complied with in all of its terms and conditions; and (c) whether the maintenance, disposition or distribution of any of the trust property has in all respects been proper.” Because the reputation of the Vanderbilt Museum has been damaged, the petitioner asserts, “it is essential to have a court of competent jurisdiction review all of the facts and circumstances relating to the Museum with a view toward finally resolving all issues which have so injured the Museum.”
The Surrogate, upon a motion by the county and State Attorney-General for an order of dismissal, determined that it had subject matter jurisdiction of the proceedings. “The surrogate’s court,” he wrote, “is the logical and proper forum for the rendering of an accounting in view of the fact that the grants herein are testamentary grants which involve fiduciary relationships. It is,” he continued, “irrelevant that the museum’s trustees are not fiduciaries as defined in SCPA 103(21).” In view of the fact that “the Suffolk County Executive and others have made serious allegations concerning the affairs of the museum which allegations have been the subject of widespread media coverage and comment” and that the “trustees in turn have publicly expressed accusations concerning the management of the maintenance fund by the county,” it would, the Surrogate opined, “be in the public interest for the Surrogate to entertain the proceedings in question and conduct an appropriate inquiry as to the validity of these charges.” The Surrogate also determined that the trustees had standing and, although no motion to dismiss as to the *506 Association was before him at the time of his decision, the Surrogate determined that long-arm jurisdiction existed “since the Association purports to exercise a power of accreditation and evaluation over museums in the State of New York.” He did not — and was not asked to — pass on the question of subject matter jurisdiction with reference specifically to the Association.
THE MOTION TO REMOVE THIS PROCEEDING TO THE surrogate’s COURT
The petitioner’s motion to remove is stated to be upon the ground that the action affects the administration of a decedent’s estate which is within the jurisdiction of the Surrogate’s Court, the Surrogate’s Court having first asserted jurisdiction in this matter. The museum’s attorney alleges in his affidavit that there “is no logical way to separate the issues involved in this Article 78 Proceeding from those necessarily involved in the pending Surrogate’s Court proceedings” in that the issues of trustee management and policies and fiscal responsibility which will necessarily be reviewed in the article 78 proceeding “are irrevocably intertwined and inseparable from the issues which must be heard and determined in the Surrogate’s Court proceedings.” The Association asserts, inter alla, in opposition to the motion that the question of accreditation does not affect the administration of the Vanderbilt estate as required by CPLR 325 (subd [e]).
Section 325 (subd [e]) provides: “Where an action pending in the supreme court affects the administration of a decedent’s estate which is within the jurisdiction of the surrogate’s court, the supreme court, upon motion, may remove the action to such surrogate’s court upon the prior order of the surrogate’s court. The right of jury trial shall be preserved in the subsequent proceedings.” It appears that the Surrogate has jurisdiction to determine ancillary matters over which it would not have had original jurisdiction (see, e.g., Matter of Venblow, 2 AD2d 365; Matter of Auditore, 223 App Div 654, mod 249 NY 335; see 1 Syracuse L Rev 442). However, it also appears that it has no jurisdiction — ancillary or original — over matters over which the Supreme Court has exclusive jurisdiction. Section 12 of article VI of the New York State Constitution *507 provides in pertinent part that: “d. The surrogate’s court shall have jurisdiction over all actions and proceedings relating to the affairs of decedents, probate of wills, administration of estates and actions and proceedings arising thereunder or pertaining thereto, guardianship of the property of minors, and such other actions and proceedings, not within the exclusive jurisdiction of the supreme court, as may be provided by law.”
Section 19 of article VI of the New York State Constitution provides that: “a. The supreme court may transfer any action or proceeding, except one over which it shall have exclusive jurisdiction which does not depend upon the monetary amount sought, to any other court having jurisdiction of the subject matter within the judicial department provided that such other court has jurisdiction over the classes of persons named as parties.”
It appears that the Supreme Court has exclusive jurisdiction over article 78 proceedings (see CPLR 7804, subd [b]; Matter of Naima C., 39 AD2d 964; Matter of A. E. Ottaviano, Inc. v McMorran, 48 Misc 2d 279; Reiser v State of New York, 198 Misc 647; Matter of Hennessy, 67 AD2d 1089, affd 48 NY2d 863; Housing & Dev. Admin, of City of N. Y. v Community Housing Improvement Program, 90 Misc 2d 813, affd 59 AD2d 773; Matter of Voccola v Shilling, 88 Misc 2d 103, affd 57 AD2d 931; Matter of Sovocool v David, 7 AD2d 262). Although the form of the action does not standing alone mandate a denial of the motion to transfer if the substance of the action is within the Surrogate’s jurisdiction (see Matter of Poliak, 183 Misc 671), the gravamen of the instant action sounds in contract (discussed infra), a contract between living persons over which the Surrogate may not have even ancillary jurisdiction since such a contract may be deemed independent and not one that affects the estate of a decedent (see, e.g., Matter of Jemzura, 65 AD2d 656; Schoelles v Zausmer, 2 AD2d 979). The power of the Surrogate’s Court relates to matters affecting estates of decedents and not to independent matters involving controversies between living persons (Matter of Lainez, 79 AD2d 78, mot to dismiss opp den 54 NY2d 830; Matter of Piccione, 85 AD2d 604).
*508 Since the Supreme Court should not transfer a matter to the Surrogate’s Court where the power of the Surrogate to grant the relief requested is in doubt (see, e.g., Greenfield v Realty Funds, 14 AD2d 896; Emmerich v City Bank Farmers Trust Co., 270 App Div 1003; Matter of Janowitz, 164 Misc 936), the motion to remove will be denied.
THE CROSS MOTIONS TO DISMISS ON POINTS OF LAW
The Association urges first that this court does not have in personam jurisdiction over the Association or subject matter jurisdiction of this proceeding. It seems clear that, even though the Association is chartered in the District of Columbia, it is subject to in personam jurisdiction in this court. The physical presence in this State of agents of the Association (the “Visiting Committee” or the “Senior Examiner”) “is one of the most concrete manifestations of [its] purposeful activity in New York” (McLaughlin, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR C302:10, p 74). It is not disputed that the Association requested the agent to perform purposeful acts in New York for the principal’s benefit (Abbate v Abbate, 82 AD2d 368) and there is no issue of fact with respect to the agent’s activities (cf. Dulman v Potomac Baking Co., 75 AD2d 863). Although the final determination appealed from was apparently made in the District of Columbia, the investigation and recommendation of the “senior examiner” was made in New York and the conduct which is the subject of the Association’s determination occurred in New York (see Matter of Garofano v United States Trotting Assn., 78 Misc 2d 33).
The Association asserts that the court lacks subject matter jurisdiction because it is a nonprofit, private voluntary association whose internal workings are not subject to review in an article 78 proceeding. Indeed, mandamus is not a proper remedy in an action against an unincorporated association (see, e.g., People ex rel. Solomon v Brotherhood of Painters, Decorators & Paperhangers of Amer., 218 NY 115; McKane v Adams, 123 NY 609; Matter of Newman v Smith, 263 App Div 85, affd 289 NY 545; People ex rel. Donnelly v Cahill, 212 App Div 815; Matter of Weidenfeld v Keppler, 84 App Div 235, affd 176 NY 562) but an article 78 proceeding is proper where a private *509 nonprofit organization has incorporated (see, e.g., Matter of Carr v St. John’s Univ., 12 NY2d 802; Matter of Caso v New York State Public High School Athletic Assn., 78 AD2d 41; Morgan v New York Racing Assn., 72 AD2d 740; Matter of Paglia v Staten Is. Little League, 38 AD2d 575; Matter of Garofano v United States Trotting Assn., supra; CPLR 7802, subd [a]). In response to a request from the court, the Association has submitted an affidavit which states that the Association was incorporated in the District of Columbia in 1920.
Although the Association originally moved to dismiss the petition for failure to state a cause of action, both parties have submitted exhibits, affidavits, memoranda and otherwise argued the merits and the Association subsequently requested a preanswer “final judgment” (CPLR 3211, subd [c]; see, e.g., Matter of Knickerbocker Field Club v Site Selection Bd. of City ofN. Y., 41 AD2d 539). Thus, the motion to dismiss for failure to state a cause of action will be treated as one for summary judgment.
THE MOTION FOR SUMMARY JUDGMENT
It appears that the “law of associations” (see Tedeschi v Wagner Coll., 49 NY2d 652) as it has evolved in New York has traditionally been predicated on a contract theory (see 76 Harv L Rev 983,1001; see, e.g., Polin v Kaplan, 257 NY 277; Anthony v Syracuse Univ., 224 App Div 487; West Virginia Pulp & Paper Co. v Lewis, 17 Misc 2d 94, affd 8 AD2d 899). Thus, the courts (rather than substituting their judgment for that of the governing body of the organization) will examine the record to ascertain whether the challenged procedure was in accordance with the association’s constitution and by-laws (Watkins v Clark, 85 Misc 2d 727; Matter of Nametra, Inc. v American Soc. of Travel Agents, 28 Misc 2d 291).
However, even the courts in those jurisdictions professing to adhere to the contract theory often impose external standards in cases in which the rules do not provide sufficient procedural protection (76 Harv L Rev, at p 1027). Thus, some kind of notice and a hearing is often required even where no such provisions are found in the by-laws before a member can be suspended or expelled — at least *510 where the association is formed for economic purposes or where members are entitled to privileges or rights of property (see, e.g., Wachtel v Noah Widows & Orphans’ Benevolent Soc., 84 NY 28; Brooks v Engar, 259 App Div 333; Levy v Amateur Skating Union of U. S., 56 Misc 2d 257; Matter of Nametra, Inc. v American Soc. of Travel Agents, supra; Sloan v Braun, 20 Misc 2d 204; Cabana v Holstein-Friesian Assn, of Amer., 112 Misc 262, mod in part 196 App Div 842, affd 233 NY 644; Glauber v Patof, 183 Misc 400, affd 269 App Div 687, revd on other grounds 294 NY 583; Reid v Medical Soc. of Oneida County, 156 NYS 780, affd 177 App Div 939; Harmon v Matthews, 27 NYS2d 656). Thus, a complete statement of the rule in New York is as follows: “The well-established rule governing interference by the courts with the internal affairs of voluntary associations and membership corporations in regard to their disciplinary proceedings is, that the court will look into the record to see whether the practice and proceeding has been in accordance with the constitution and by-laws of the organization, whether the charges are substantial, and whether the member has had fair notice and opportunity to be heard. In short, has the member received fair play? If so, the court will not substitute its judgment for that of the organization” (People ex rel. Holmstrom v Independent Dock Bldrs.’ Benevolent Union of Greater N. Y. & Vicinity, 164 App Div 267, 270).
It appears that participation in a voluntary accreditation program is substantially similar to membership in a voluntary membership association and that the cited rules which evolved primarily in litigation involving disciplinary action by membership associations (which is how the Association describes itself) are applicable (see Marjorie Webster Jr. Coll, v Middle States Assn, of Colls. & Secondary Schools, 432 F2d 650, 652, n 1). However, although the Vanderbilt Museum is a member of the Association, an institution is not required to be a member in order to be accredited.
THE PROCEDURES
The rules governing the accreditation process as promulgated by the Association provide as follows:
*511 “1. Reaccreditation will take place at any time following the fifth anniversary of accreditation, and thereafter at regularly scheduled intervals.
“2. The Accreditation Commission will initiate reaccreditation visits and determine the order in which institutions will receive them. Those institutions in which deficiencies have been reported to the commission will appear early on the schedule of reinspections. Specific museum requests for early reaccreditation will be honored.
“3. Upon notification by the commission that a reaccreditation visit will be scheduled, the museum will review its original questionnaire and its visiting committee narrative report and checklist and will complete a reaccreditation questionnaire. Current data on staffing, finances, programs and significant changes in structure, operations and collections will be required.
“4. The museum will have three months within which to acknowledge notice that it is to undergo reaccreditation and to complete the required documents. Upon receipt of these submissions, the commission will arrange the reaccreditation visit. . If a museum does not complete preparations during this period, it will be notified that failure to respond before the expiration of an additional three-month period will result in automatic withdrawal of accreditation.
“5. If material submitted for reaccreditation makes it clear that the museum no longer fulfills the basic definition, the commission may table or refuse the application for reaccreditation at this point.
“6. Unless a museum’s application has been tabled or refused on the basis of its reaccreditation submission, the process of reaccreditation will include a visit to the museum by a single designated representative (not a member) of the commission. These representatives will be known as senior examiners and will be persons with extensive experience both in museum administration and in accreditation. The institution will have the right to challenge the choice of examiner made by the commission. It is anticipated that one full day’s inspection will serve in most cases to verify or question statements appearing in the reaccreditation questionnaire. Travel and subsistence expenses *512 will be borne by the institution, in addition to reaccreditation fees of $300 for members of the AAM and $400 for nonmembers.
“7. Following completion of the visit, the senior examiner will submit to the commission a narrative report and a checklist. These will ultimately be forwarded to the applicant institution when the commission has reached its final decision. If the commission determines that the institution still meets acceptable standards, it will be informed of its reaccreditation by the commission. If, however, disabling deficiencies are exposed that cause the commission to doubt whether continuing accreditation is merited, the institution will be notified and given six months in which to correct these deficiencies and request reinspection by a senior examiner or, if necessary, by a visiting committee. The expenses for the reinspection will be borne by the institution. If the second report is also negative, the commission will then withdraw accreditation. The institution may invoke the existing appeals procedure described earlier if it wishes to protest the withdrawal.”
It appears that all these steps were taken in the instant case except that the museum was not given six months in which to correct deficiencies and the reinspection procedure was not provided for. Instead, the commission, upon determining that deficiencies existed, suspended the museum’s accreditation under a section of the published procedures which appears to be unrelated to the reaccreditation process. That provision reads in part as follows:
“An accredited museum may have its accreditation suspended on the initiative of the Accreditation Commission for stated reasons. This may occur when the commission finds that changes in the museum’s operations or organization appear to be so disabling that it either no longer fulfills the basic definition in every respect or no longer carries on its affairs with at least minimum standards.
“The commission will first obtain confirmation of the facts on which it bases its decision to suspend a museum’s accreditation is made, the chairman of the Accreditation Commission will notify the museum’s director and the chairman of the board of trustees by letter setting forth the *513 reasons for suspension. The museum may not display any evidence of accreditation while under suspension.
“Suspension shall be for a minimum of one year, but not longer than three years, at the end of which time accreditation will be automatically withdrawn. The suspended museum may at any time after the first year and before the withdrawal of accreditation, make a request for reconsideration of its status. At its next regular meeting the commission will consider this request and the reasons presented.”
Here, the visiting committee (or senior examiner) recommended, after his on-site visit, that “accreditation be tabled” because of the following deficiencies: “decline in image due to internecine disputes, lawsuits and professional criticism — failure to provide prompt remedial measures with respect to major structures and damaged elements of the collections — emphasis on maximum surplus while deeds of professionals neglected.” On the checklist, the senior examiner had checked the column marked “satisfactory” with respect to an item labeled “care”. However, in its letter announcing its decision, the accreditation commission stated as its specific reason for suspending the museum’s accreditation that it believed “the museum does not meet the ‘care’ aspect of the definition of a museum.” Although the suspension provisions of the Association’s rules do not provide for reconsideration prior to the end of the first year of suspension, the museum appealed immediately on the ground that it had not been given notice or an opportunity to controvert the commission’s conclusions and that it had been denied the six months’ cure period provided for in the accreditation procedures. In addition, it disputed the commission’s findings on the merits. Upon review, the commission upheld its original decision, stating that its “authority to suspend a museum’s accreditation for cause may be invoked at any time and may be invoked by the Commission itself” and that its authority was not limited in this case merely because “the museum was in the midst of a reaccreditation process.” Furthermore, the commission opined, the “recommendations of the senior examiners are solely for the guidance of the Commission and the Commission is not bound by them.”
*514 Since the reaccreditation procedures do not make any provision for outright suspension but instead provide for a cure period should deficiencies be discovered, it appears that the museum would have had no way of anticipating the commission’s action. Thus, even if it is assumed, arguendo, that the procedures authorize the action taken, the question of notice and an opportunity to be heard — or “fair play” — becomes an issue.
The museum casts its contention that such procedures were required in terms of due process, urging that the Association is somehow performing a State function. But it appears that restrictions on the Association of constitutional dimensions are not warranted: the Association has not been delegated a State function, it does not have a close relationship with the State, nor does it exercise a State function (see 76 Harv L Rev 983, 1059; cf. Matter of Caso v New York State Public High School Athletic Assn., 78 AD2d 41, supra). The fact that it receives some funding in the form of Federal grants does not convert its actions into State actions (see, e.g., Greenya v George Washington Univ., 512 F2d 556, cert den 423 US 995). Nevertheless, the Association does exercise a function which has extensive economic impact on museums, affecting their ability to obtain funding from both governmental and private sources. In fact, the Association itself defines its function (in its published procedures) as, inter alla, providing a “qualitative judgment” for private and governmental agencies “considering requests for contributions, grants and contracts.” In the instant case, it appears that the Suffolk County Legislature voted not to appropriate funds for the museum after learning of the suspension of its accreditation.
The fact that accreditation has such evident economic impact upon museums together with the fact that the museum here was given no notice of the commission’s determination not to follow its published procedures for accreditation compels the conclusion that considerations of “fair play” (.People ex rel. Holmstrom v Independent Dock Bldrs.’ Benevolent Union of Greater N. Y. & Vicinity, 164 App Div 267, supra) dictate that the museum should have been afforded both notice and a hearing on the charges *515 upon which the commission’s decision to suspend its accreditation was based. The case is clearly sui generis, however, and this determination is in no way intended as a finding that a hearing should be afforded in other circumstances.
CONCLUSION
The motion to remove the proceeding to the Surrogate’s Court is denied. The cross motion to dismiss upon the ground that-the court lacks subject matter and in personam jurisdiction and that the petition fails to state a cause of action is denied. The cross motion is also denied insofar as it is predicated on CPLR 217 since the notice of petition and the petition were served within four months after the commission’s denial of the museum’s appeal. The petitioner is entitled to an order directing the respondent within a reasonable period of time to conduct a hearing on notice to the petitioner, at which hearing the petitioner shall be afforded an opportunity to present witnesses and other evidence in support of its claim that it is entitled to continued accreditation.