OPINION OF THE COURT
Edward J. Greenfield, J.
An investigation of the long unsolved murder of an heiress ultimately led to the conclusion that she had been done away with because she knew too much about an ongoing scheme to kill show horses for insurance money. Surveillance then led to the arrest of the alleged horse hit man, one Tommy Burns, also known as Timmy Ray, known in his circle as "The Sandman.” On his arrest, Burns, complaining that his "clients” had failed to rally to his support, named several prominent riders and horse owners as the persons for whom he had performed these nefarious jobs. Those named included persons of considerable wealth and prominence in the equestrian world.
When allegations and rumors as to Burns’ revelations became known,[1] the American Horse Shows Association (the Association), which governs and controls all horse shows, contests and exhibitions in the United States and the persons deemed eligible to perform therein, quickly changed its rules to deal with the growing scandal. The Association already had a rule providing for suspension of a member who was found guilty in a civil or criminal court of actions which involved cruelty to a horse. That rule was amended in April 1993 to provide for suspension or expulsion of any person indicted for any act of cruelty or abuse to a horse, including deliberately killing a horse.
In the late summer of 1994, a Federal Grand Jury in Illinois, acting largely on the information supplied by Tommy Burns, indicted 23 horse owners, trainers and riders for con *939 spiracy to collect insurance proceeds by arranging for the killing of their horses. Among those indicted, on the basis of the information provided by Burns, was horse owner George Lindemann, Jr., a leading national and international rider in jumping and dressage competitions, and an aspirant for the United States Olympic Team. Mr. Lindemann was, according to press reports, the son of one of the wealthiest men in America, his father being the developer of cellular telephone technology. He had established a stable and training facilities in Armonk, New York, and Greenwich, Connecticut, appropriately named "Cellular Farms.” Also indicted with him was Marion Hulick, Lindemann’s trainer and manager of operations. They were both accused of conspiring to arrange with Burns for the electrocution of his prize jumper named Charisma, to collect insurance proceeds of $250,000.
All those indicted were immediately notified by the Association that in light of the adverse publicity and the barrage of news stories, they were being charged with a violation of the Association’s rules as to equine cruelty, and subject to suspensions following a hearing. They were notified that the hearing would consider the fact of the indictment, the seriousness of the charges, the applicability of the Association’s rules and the importance of prompt action. They were also given the names of the hearing committee members who would be present at the hearing in New York City.
At the hearing, counsel for Lindemann and Hulick requested an adjournment to prepare their defenses and for the opportunity to present exculpatory evidence. The hearing committee denied the application for adjournment unless plaintiffs would accept voluntary suspension. Upon the close of the hearing, anticipating the result, plaintiffs commenced an action against the Association in this court asking for injunctive relief to prevent suspension, and for damages, and sought and obtained at the outset a temporary restraining order barring suspension of the plaintiffs until a motion challenging the hearing could be heard. That application was, in fact, made before the hearing committee had issued any findings or decision. When the findings were issued the Association issued a press release announcing the suspensions of 22 of its members who had been indicted for equine insurance fraud, including the plaintiffs. The release quoted Bonnie Jenkins, the Association’s Executive Director, to the effect that: "all those charged had the opportunity to be heard. I am proud that the Association has been able to react responsibly *940 to the challenge presented by these unprecedented allegations of horse abuse.”
The Association then promptly applied to the court to vacate the temporary restraining order, and the court heard arguments by both sides as to whether or not to vacate the suspensions.
ISSUES PRESENTED
Without a doubt, having horses electrocuted to collect insurance money is a dirty and despicable business. If done by those professing a love of horses and claiming to uphold the ideals of equestrianism as a sport for ladies and gentlemen, where pecuniary reward is supposedly not a major consideration, it is an act of treason against those cherished beliefs and ideals. However, it must always be borne in mind that the blacker the crime charged, the harder it is to obliterate the stain of accusation. Those concerned with fairness must therefore tread carefully so as not to tar anyone but the guilty with an unsubstantiated accusation of the commission of a heinous crime.
Public reaction to a scandal, especially one involving persons of prominence and leadership, puts to a real test all our vaunted principles about the presumption of innocence, for the stronger the public revulsion, the greater the demand to "do something”, even before all the facts can be fully aired.
The question here presented is whether a person charged with a crime can be summarily and indefinitely suspended from his or her position or from the exercise of rights and privileges on the basis of the accusation alone, until a court and a jury has either exonerated that person or found such person to be guilty. It should be noted that ever since the time which has become known as the age of McCarthyism, we have become much more reluctant to act hastily to suspend people based on mere assertion or accusation. Nevertheless, there may be some compelling circumstances where maintenance of the status quo and the retention of accused persons in sensitive positions pending a plenary trial cannot be tolerated. Courts, corporations, and private associations have been painfully groping for a sensible solution which will be fair to all concerned.
PROCEDURAL POSTURE
The complaint in this case alleges that the defendant Association, in exercising its exclusive control over equestrian *941 sport to bar plaintiffs from competition, violated antitrust provisions of the Donnelly Act (General Business Law § 340 et seq.), violated the due process rights of the plaintiffs and that its acts constituted a breach of contract and a breach of fiduciary duty. Plaintiffs moved for immediate injunctive relief, and the matter came on for hearing shortly thereafter on defendant’s application to vacate the temporary restraining order that had been granted to plaintiffs.
While the defendant Association has not sought dismissal of plaintiffs’ Donnelly Act claims, the court, on oral argument, indicated it was not impressed by such a claim and that the actions of the Association were more appropriately reviewable in the context of a CPLR article 78 proceeding.
The fact that a private association totally dominates a sport, and may provide for suspension of a member under certain circumstances, is not in and of itself anticompetitive. (See, Cooney v American Horse Shows Assn., 495 F Supp 424 [SD NY 1980].) Moreover, the claim of bias or conflict of interest of the hearing committee members who might themselves be owners, riders, or trainers was expressly waived by plaintiffs’ counsel at the Association hearing.[2] Unlike the situation in Blalock v Ladies Professional Golf Assn. (359 F Supp 1260 [ND Ga 1973]), where suspension was imposed in the exercise of completely unfettered subjective discretion by direct competitors of plaintiff who stood to gain financially from plaintiffs’ exclusion from the market and was therefore determined to be a per se violation of section 1 of the Sherman Anti-Trust Act, this court would be hard pressed to find any anticompetitive motives behind the hearing committee’s suspension of plaintiffs. The hearing committee members, who were not claimed to be influenced by self-interest, undoubtedly acted to protect the integrity of the sport. There was no "group boycott”, as plaintiffs claim. (Cooney v American Horse Shows Assn., supra.)
On oral argument, the court suggested and both sides essentially agreed that this matter could best be treated as a CPLR article 78 proceeding. While plaintiffs’ action was commenced before the Association’s decision actually was announced, and might otherwise be considered premature, by the time the matter came on for argument, the Association’s *942 decision had been made and was available for the court’s scrutiny. Accordingly, the court has determined that despite the form of the pleadings, this action should be converted to an article 78 proceeding. The causes of action for violation of due process rights, breach of contract and breach of fiduciary duty are, in the opinion of the court, adequately comprehended within the scope of review provided by CPLR 7803. (See, Polizotti v Polizotti, 305 NY 176; Mohrmann v Kob, 291 NY 181.)
The court therefore invokes its conversion powers under CPLR 103 (c), which provides: "(c) Improper form. If a court has obtained jurisdiction over the parties, a civil judicial proceeding shall not be dismissed solely because it is not brought in the proper form, but the court shall make whatever order is required for its proper prosecution.”
CPLR 7803 delineates the questions that may be raised in a proceeding under article 78. In this proceeding, only CPLR 7803 (3) or (4) dealing with review of the determination of a body, including membership associations, would be applicable. Sanctions imposed by the American Horse Shows Association are clearly reviewable in an article 78 proceeding. (De Leyer v American Horse Shows Assn., 27 AD2d 655; Dennehy v American Horse Shows Assn., 82 Misc 2d 846.) Judicial review herein is limited to:
"3. whether a determination was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion, including abuse of discretion as to the measure or mode of penalty or discipline imposed; or
"4. whether a determination made as a result of a hearing held, and at which evidence was taken, pursuant to direction by law is, on the entire record, supported by substantial evidence.” (CPLR 7803 [3], [4].)
VALIDITY OF THE SUSPENSION RULE
The Association has the undoubted right to promulgate reasonable rules and regulations for the governance of equestrian sport, and to suspend exhibitors upon a showing of cruelty to or abuse of a horse. (Dennehy v American Horse Shows Assn., supra; Jenkins v American Horse Shows Assn., 30 AD2d 652.)
It is to be emphasized that the Association claims that it did not purport to act solely and immediately on the basis of the *943 announcement of the indictment of the plaintiffs for allegedly having their horse electrocuted for the insurance proceeds. Indeed, automatic or mandatory suspension upon learning of such an accusation might well be considered arbitrary and violative of basic due process rights. The Association, therefore, took care to have its newly enacted rules provide that after an indictment was handed down there would be a hearing, with discretion to be exercised as to whether suspension would follow.
These provisions are embodied in article 302.6 of the Association’s rules, which became effective December 1, 1993: "Following a hearing, the Association’s Hearing Committee may * * * deny, expel or suspend the privileges of membership * * * to any person * * * whom an indictment * * * has asserted * * * to have committed or participated in any act of cruelty or abuse to a horse * * * including] * * * killing, crippling, abandoning, mistreating, neglecting or any other form of abuse of a horse.” Previously, suspension had been provided for only after a finding of guilt by a court or an Association committee.
The Association, which is the national governing body of equestrian sports in the United States, and which acts as the National Equestrian Federation of the United States and the United States Olympic Committee, sanctions and controls virtually all major horse shows conducted in the United States and controls the participation of competitors in international competition. Suspension from the Association entails loss of competitive privileges or even attendance of a suspended person at an Association sanctioned event. Such a suspension virtually eliminates an owner, trainer or other suspended individual from either national or international competition. But, even further, pursuant to the Association’s article 704, the suspension, even as to spectator status, applies to the spouse, companion, family members and others whose relationship with the suspended person would create the appearance that the affiliated person is riding sub rosa for the benefit of the suspended person.
Plaintiff George Lindemann, Jr., who appears to be recognized as one of the top equestrian riders in the United States, is an aspirant to compete in both the Pan American Games and in the Olympics as a member of the United States Equestrian Team and the United States Olympic Team, and in order to do this he must qualify in upcoming equestrian trials. A continuing suspension will effectively bar him from this *944 lifelong dream, and a subsequent finding of innocence and reinstatement to membership in the Association would be of little avail. The situation is not unlike that confronting the United States Figure Skating Association in the notorious case involving Tonya Harding. (See, Harding v United States Figure Skating Assn., 851 F Supp 1476.) It will be recalled that in that instance, despite charges of a crime involving grossly unsportsmanlike conduct, Ms. Harding was permitted to compete in the Olympics, and only after such competition had been concluded did she plead to a lesser included crime.
There is no inherent unsoundness in the Association’s rules. They do not in and of themselves permit arbitrary or automatic suspension. The rule provides that the hearing committee "may” deny or suspend the privilege to participate. Clearly, then, the work of the committee is not to be perfunctory or automatic, and its members are required to exercise their discretion as to whether or not, even in the light of an indictment, suspension is appropriate. The rule explicitly provides for the denial or suspension of privileges only "following a hearing.” Obviously, the hearing must be something more than a pro forma recital of the accusation. The question here presented is whether, under the Association’s own rules, plaintiffs were accorded a meaningful hearing, and whether the discretion exercised by the hearing committee was reasonable, or whether it was pretextual, and hence arbitrary and capricious, with no real discretion being exercised at all.
APPLICATION OF THE RULE TO PLAINTIFFS
The Association predicates the justification as to the propriety of its suspension largely upon the ruling of the United States Supreme Court in Federal Deposit Ins. Corp. v Mallen (486 US 230 [1988]), which had found a suspension of an indicted bank executive prior to hearing to be permissible.
In the Mallen case (supra), Mallen had been summarily suspended by the FDIC from his position as bank president because he had been indicted for violation of the Federal banking statutes on charges involving dishonesty and breach of trust. The Supreme Court found that prompt suspension of indicted bank officers might well be necessary to maintain public confidence in our banking institutions and could justify a brief suspension prior to a hearing. The determination of the Grand Jury returning the indictment constituted prima facie determination of probable cause. In the Mallen case, *945 however, the controlling statute required that a postsuspension hearing and determination be had within 90 days of a request therefor. The hearing would determine whether the person suspended posed a threat to the interests of the bank’s depositors or threatened to undermine public confidence in the bank. In that case, Hallen made no attempt to offer proof with respect to whether his continued service would affect the bank’s security and reputation.
Certainly, a bank officer, a CIA agent, a policeman or a Judge may be temporarily suspended (subject to reinstatement), when continued service until cleared would taint every aspect of his or her job performance or decision-making. There are others, however, whose continuation does not present so clear a threat of possible continuing misconduct. The balance here must be drawn between public protection and individual rights.
It is apparent that the Association in this case put the entire emphasis on protecting its own reputation. The hearing committee determined that its objective was "to maintain public confidence in the integrity of the sport”, and to ensure "that persons engaging in the sport will not be associated in the minds of association members and members of the general public with fraudulent, corrupt and cruel practices and that the sport will be kept free of such activities or even the appearance of corrupt and cruel practices or improprieties.” They concluded that "should individuals, such as Mrs. Hulick and Mr. Lindemann, who are accused of acts of extreme cruelty be allowed to participate in recognized competition while those accusations are pending, the image of equestrian sports will be tarnished”.
The panel piously recited that while no one should draw an inference of guilt, the sport would be harmed if those accused were to continue to have the opportunity to be members or participate in Association recognized events. Accordingly, the panel voted to impose indefinite suspension until further notice, pending ultimate disposition of the criminal proceedings. It declined to pass on any of the exculpatory material offered by plaintiffs’ counsel.
In her affidavit, Bonnie B. Jenkins, Executive Director of the Association, likewise put the focus on public concern as to the Association’s response to the indictments. She was concerned about "sending a message”, and declared that in view of the charges of cruelty, the Association could not permit *946 "business as usual”. She further argued that the issuance of an injunction by this court, even a temporary one, "would send a message across the national media that the rules may be violated with impunity”. This focus on public opinion and public perception as the primary motivation, above all else, highlights the basic difficulty with the Association’s procedures. It could not permit further affiliation with the kind of people accused of these dreadful things, whether they did them or not. "They may not be guilty”, they are saying in effect, "but until cleared they should be ostracized”.
It is a strange and myopic perspective which appears to elevate concern over the alleged rights of animals over those of human beings — putting the horse before the rider, so to speak. This court has always striven to strike a balance in which the symbiotic relationship between humans and animals is kept in equilibrium. (See, New York Horse & Carriage Assn. v City of New York, 144 Misc 2d 883; Schnapp v Lefkowitz, 101 Misc 2d 1075.) However, the Association, in its overriding concern that it must not appear to condone cruelty to animals, and to encourage the perception that it be seen to be doing something, seems to have given short shrift to the rights of the human beings involved — the right to be presumed innocent except upon proper proof, the right to a prompt and fair hearing, and the right to be free of hasty and arbitrary conclusions formulated under pressure.
The Mallen case (supra) does not, as the Association appears to argue, stand for the proposition that an indictment in and of itself warrants an indefinite suspension. Indeed, the statute there required a postsuspension hearing within 90 days. These FDIC statutory provisions providing for temporary suspension, postsuspension hearing and standards for the exercise of discretion in determining whether or not there should be a suspension were brought about in response to an earlier decision in Feinberg v Federal Deposit Ins. Corp. (420 F Supp 109 [1976]). Feinberg had held that a suspension based only on the fact of indictment for a felony without providing for a meaningful hearing was an unconstitutional denial of due process. It explicitly declared: "The criminal trial is hardly the proper or timely hearing for the deprivation at issue * * * [T]he interim between indictment and trial is sufficient time within which plaintiff’s interest could be permanently and irreparably impaired.” (Supra, at 118.)
The procedural defects there were twofold. First, the lack of any provision for a postsuspension hearing short of ultimate *947 trial, and second, the unfettered discretion given to suspend or not to suspend. The court in Feinberg stated that the agency was not merely required to decide whether the nature of crime charged involved dishonesty or breach of trust, but was also required, because the statute provided that the agency "may” suspend, to exercise discretion as to the underlying facts. When the exercise of discretion is called for, the court indicated it looked askance at the implied emphasis of the statute on "insuring] the public’s confidence” as the key element in any fair hearing. The court expressed its misgivings that with respect to guidelines for the exercise of discretion: "The only ascertainable guidance is the general purpose of the statute: to insure the public’s confidence in the stability of the financial institution. Given the fact of and the extent of the discretion which attends the issuance of a Notice and Order of Suspension, coupled with the resultant deprivation of a constitutionally-protected right, it is therefore clear that there is a need here for imposing the safeguards of due process; for, the 'touchstone of due process is protection of the individual against arbitrary action of the government, Dent v. West Virginia, 129 U.S. 114, 123 [9 S.Ct. 231, 233, 32 L.Ed. 623] (1889),’ Wolff v. McDonnell, 418 U.S. 539, 558, 94 S.Ct. 2963, 2975 (1974).” (Feinberg v Federal Deposit Ins. Corp., 420 F Supp 109, 117-118.) Other matters which might well be involved in the exercise of discretion would include possible exculpatory matters or elements of mitigation, the length of the suspension, and the impact upon the individuals suspended.
When a person is barred from membership in a club it might have minimal impact. Suspended from a job, he or she might find another, but when barred from privileges in an association which monopolizes the enterprise to which persons devote their careers even greater care must be taken to safeguard the rights of the individual. The Supreme Court had previously held, in Barry v Barchi (443 US 55), involving the summary suspension of a harness racing trainer: "the consequences to a trainer of even a temporary suspension can be severe; and we have held that the opportunity to be heard must be 'at a meaningful time and in a meaningful manner.’ Armstrong v. Manzo, 380 U.S. 545, 552 (1965).” (Barry v Barchi, 443 US, supra, at 66.) The Supreme Court in that case noted the pragmatic observation by the lower court that because: " 'meetings’ are sporadic, trainers cannot recapture the racing opportunities lost by missed meetings. Once a *948 trainer is suspended, even for a brief period, an owner will immediately seek the services of another trainer so that the horse is not barred from racing. This change is often permanent in order to avoid further disruption in the care of the animal *' * * [Opportunities lost because of a suspension cannot be recovered by a later reversal in [a] review hearing for obvious reasons. Furthermore, defendants do not dispute the fact that a loss of horses in a trainer’s stable occasioned during his suspension can often be an irremediable injury, even though such suspension is erroneous and without justification.” (Barchi v Sarafan, 436 F Supp 775, 778 [SD NY 1977].)
INDIVIDUAL RIGHTS MUST BE SAFEGUARDED BY NONGOVERNMENTAL ORGANIZATIONS
It may well be that the Fifth and Fourteenth Amendments of the United States Constitution do not directly apply to the actions of the Association as a private organization with no nexus to either State or Federal Government. The fact that the Association completely controls equestrian competition in this country does not in any sense make it an agent of the State, unlike horse racing and betting agencies vested with powers by statutory enactment and intertwining such agencies with the State. Nevertheless, an arbitrary action by a private organization carries many of the earmarks of a deprivation of due process. In many areas the requirements of due process are congruent and comport with the scope of review under article 78 standards as set forth in CPLR 7803, particularly if one recognizes the principle that "due process comes down to a kind of fundamental fairness, measured by tradition and conscience.” (Matter of Ryan v Hofstra Univ., 67 Misc 2d 651, 670.) In fact, a determination resulting from a denial of procedural due process has been held to render such decision arbitrary and capricious. (Matter of Syquia v Board of Educ., 149 Misc 2d 463, 472, affd 180 AD2d 883, affd 80 NY2d 531.) "Call it bias, or lack of due process, or lack of fundamental fairness, it is all the same, and violative of the American idea of justice.” (Supra, 149 Misc 2d, at 468.)[3]
*949 And in Matter of Fuller v Urstadt (28 NY2d 315, 318), the Court of Appeals held that whether it be called due process or not, an individual is to be free from arbitrary and capricious rules and hearing procedures resulting in actions unsupported by substantial evidence. Under article 78 (whether the claim be a violation of CPLR 7803 [3] or [4]), the test is one of rationality. As stated in Matter of Pell v Board of Educ. (34 NY2d 222, 231): "Rationality is what is reviewed under both the substantial evidence rule and the arbitrary and capricious standard. (Matter of 125 Bar Corp. v. State Liq. Auth., 24 N Y 2d 174, 178; 1 N. Y. Jur, Administrative Law, § 184.)”
Pell (supra) stands for the very proposition "that any determination that lacks substantial evidence * * * would necessarily be an arbitrary and capricious decision” (ARC Plumbing & Heating Corp. v Board of Responsibility, 135 Misc 2d 413, 414, n 1). Therefore, "rationality” must necessarily mean that the question to be reviewed is one of whether the evidence presented could rationally form the basis of the determination reached where the issue of substantial evidence is raised.
Under New York law a fair hearing involving the possible suspension of a property right is "an obligation imposed * * * by those fundamental principles of basic justice and fair play which underlie our entire system of jurisprudence.” (See, Matter of Hecht v Monaghan, 307 NY 461, 469.) It is fundamental that a trial or hearing before a voluntary association must also be fair and impartial. (Bloch v Veteran Corps of Artillery, 61 AD2d 772, 773; see also, Finley & Co. v Kuhn, 569 F2d 527, cert denied 439 US 876; Hatley v American Quarter Horse Assn., 552 F2d 646.) The latter case called for "something akin to traditional due process on the part of voluntary associations.” (Supra, 552 F2d, at 656.)
The fact that the Association is a nongovernmental agency will not serve to eliminate the requirements of fundamental fairness. "[T]he arbitrary action of a private association is not immune from judicial scrutiny * * * where there is a showing of 'economic necessity’ for membership and 'monopoly power’ over the profession” (Jacobson v New York Racing Assn., 33 NY2d 144, 150).
The observations of the court in Falcone v Middlesex County Med. Socy. (34 NJ 582, 595-596, 170 A2d 791, 798-799) are particularly pertinent: "When courts originally declined to scrutinize admission practices of membership associations they *950 were dealing with social clubs, religious organizations and fraternal associations. Here the policies against judicial intervention were strong and there were no significant countervailing policies. When the courts were later called upon to deal with trade and professional associations exercising virtually monopolistic control, different factors were involved. The intimate personal relationships which pervaded the social, religious and fraternal organizations were hardly in evidence and the individual’s opportunity of earning a livelihood and serving society in his chosen trade or profession appeared as the controlling policy consideration.”
WAS THERE A MEANINGFUL HEARING?
There can be no doubt that any member subject to suspension or expulsion from an association which controls its field is entitled to fair notice and a meaningful opportunity to be heard. (Mathews v Eldridge, 424 US 319, 333; Vanderbilt Museum v American Assn. of Museums, 113 Misc 2d 502, 514; Jackson v American Yorkshire Club, 340 F Supp 628, 632.)
There can be no fair and impartial hearing unless the person charged is accorded a meaningful opportunity to respond to the charges and to rebut them. If the hearing is a mere formality, and nothing presented thereat by the persons charged would alter the predetermined result, then certainly a meaningful hearing has not been afforded.
Given the declared objectives of the Association, its predominant concern for its self-image, and its desire to keep the suspensions in force, the question is whether the hearing committee had any desire to afford to plaintiffs a real hearing, or whether the hearing was regarded as an annoying hurdle to overcome before reaching a foregone conclusion.

Refusal to Grant Continuance

Plaintiffs requested a brief postponement of the hearing so they could prepare their defense and present witnesses. The rules of the Association call for the granting of a continuance of a hearing "for good cause shown”. Ordinarily, the exercise of discretion as to whether or not to allow for more time is largely up to the hearing body or officer, and the determination is not lightly to be disturbed. Here however the hearing was called on 20 days’ notice, and plaintiffs’ counsel asked for more time to prepare their defense. It had taken two years for the indictments to be announced. What was the urgency *951 presented? The Executive Secretary, in her concern about the public outcry, said candidly that granting any delay "would send the wrong message”. There appeared to be little concern for the rights and needs of the plaintiffs.
The hearing committee refused to countenance any delay. Even the Assistant United States Attorney, who had not yet provided the plaintiffs with any exculpatory evidence in the government’s possession, requested that the suspension hearing be postponed. Plaintiffs’ counsel also presented an affidavit from an investigator to the effect that Tommy Burns, the principal informant, had admitted to another person that he was trying to extort money from Lindemann by threatening falsely to name him as a person who had employed him to kill a horse. That investigator would not be available for another week or two. In the light of the committee’s determination not to deal with any evidence going to the issue of guilt, its refusal to grant any further time for a defense is readily comprehensible. The panel indicated that they would consider a continuance only if plaintiffs would agree to a voluntary suspension.
Thus, plaintiffs here, as in Saumell v New York Racing Assn. (58 NY2d 231), were "faced with the Hobson’s choice of an immediate hearing without a full opportunity to prepare or deferring the hearing for a sufficient time to prepare but with consequent loss of income.” (Supra, at 242.)
As had been stated by the court in the Tonya Harding case, where there was even greater notoriety about continued participation by an accused association member, equity is not to be subordinated to the perceived need for speed. "[P]laintiff was entitled to additional time to prepare for the hearing. The harm to plaintiff greatly outweighed the harm to defendant from postponing the hearing * * * [i]n this case, equity was sacrificed for speed.” (Harding v United States Figure Skating Assn., 851 F Supp 1476, 1479-1480, supra.) It is to be noted that although Harding was permitted to participate in the Olympic games despite scandal and media frenzy, there was no resulting stain or damage to the sport, which emerged more popular than ever.

Failure to Hear Exculpatory Evidence

While the Association takes the position, a not unreasonable one, that it could not substitute itself as the ultimate tribunal to determine guilt or innocence, that it was not in possession *952 of the incriminating evidence, that it had no access to the informant who had made the accusations, and that it had no way to pass upon his credibility, that does not mean that it could shed all its responsibilities, defer any meaningful hearing and fail to afford plaintiffs even the shadowy semblance of fair play.
Although the indictment itself may be a prima facie indication of probable cause as to the crime charged, it is in reality no more evidence than are plaintiffs’ pleas of not guilty. It is merely the formal method of accusing a defendant, and under the Federal rules the Grand Jury considers only such evidence as the prosecutor chooses to place before it, with no weighing or counterbalancing of exculpatory evidence. The indictment and the not guilty plea creates the issue and is enough, under the Association’s rules, to trigger the requirement for a hearing. If unrefuted, or unexplained, the indictment may be the basis for suspension. It is the beginning, but not the end of the hearing process.
It was claimed that plaintiffs’ horse, Charisma, had been deliberately electrocuted in a manner which would simulate death by colic. Two veterinarians who had examined the horse postmortem found no evidence of electrocution, and one had opined that the horse’s death was possibly related to a collapsing episode a few days before. They did not even find evidence of colic. The hearing committee refused to pass on that proof, and failed to adduce any testimony on the central fact of whether there was any scientific or medical basis for concluding that death by electrocution was indistinguishable from death by colic. How can the cause of death now be established years after the autopsy, other than on the say-so of the alleged executioner? The hearing committee declared: "The panel felt it should await the outcome of the criminal proceedings before attempting conclusions about evidence of this nature. The panel felt the same way about the private investigator’s evidence and the evidence which may or may not be forthcoming from the witness recently located.” No independent proof was ever adduced as to whether Tommy Burns had ever met Lindemann, and there was no inquiry as to whether there was any corroboration of any aspect of his story.
The exhibits that were marked in the hearing all related to the fact of the indictment, and the mechanics of setting up the hearing. There was no meaningful hearing as to the merits, no opportunity to present evidence to rebut the charges, and no weighing of any alternatives to indefinite suspension. What *953 the panel did consider was whether the indictment alleged cruelty, and what the public perceptions might be about the accusations. Under those circumstances, the Association rule which calls for a hearing and the exercise of responsible discretion was wholly illusory in its application. The indictment was the first word, and the last.
As noted by our Court of Appeals in Saumell v New York Racing Assn. (58 NY2d, at 242, supra), while the association "was not obligated to resolve questions of credibility before denying petitioner access to its facilities, the evidence * * * was at best equivocal and, in light of the 20-day delay and the importance of access to petitioner’s livelihood, an insufficient basis for exclusion without a hearing.”
The Association persists in arguing that it can suspend a member based upon an indictment alone. It may do so temporarily under its rule 608, but only if a hearing promptly follows. Why a hearing if an indictment is enough? Cases the Association cites for that point, such as New York State Asphalt Pavement Assn. v White (141 Misc 2d 28) and Schiavone Constr. Co. v LaRocca (117 AD2d 440, lv denied 68 NY2d 610), hold that proof an indictment has been handed down against a contractor can result in a determination by a public agency that the contractor is not a responsible bidder. That gives us no guidance here, for different considerations apply with respect to a discretionary decision by a governmental agency not to enter into a public contract, as contrasted with a private association banishing a party entirely. A contractor barred from one job is still free to get others in the field. Even in bidding situations, the contractor must be afforded an opportunity to rebut the charges. (Schiavone Constr. Co. v LaRocca, supra.) Affected contractors must be given "the opportunity to appear and present any information or evidence they deem relevant to rebut the information relied upon by the respondents”, even though a full adversarial hearing might not be required. (New York State Asphalt Pavement Assn. v White, supra, at 35.)
Certainly, the indictment, as an accusation or assertion, is not conclusive. Many persons indicted are, in fact, acquitted. A short-term temporary suspension may be warranted, but here we are talking about a suspension of indefinite duration, until such time as the criminal charges are disposed of. Many months have already elapsed and final disposition may take years. A genuine opportunity to present evidence rebutting *954 the accusation should have been accorded — character, motivation, opportunity, and other matter countering the charges.
Is it easier to believe that Lindemann, with a family fortune of hundreds of millions of dollars available, would risk his career, his reputation and his personal freedom for a fraudulent insurance payment, rather than that a shady character like Tommy Burns would concoct an accusation against him when an extortion plot did not pan out? All things are possible, but all things must be weighed and considered.
Although the record indicates that there were many exhibits before the committee, they consist largely of the hearing notices, the indictment, the exchange of letters between counsel and the committee, the testimony of the Executive Director as to the fact of the indictment and her concern with public opinion, and the proffered and rejected evidence of the investigator and the veterinarians. It is apparent that the Association, in calling for a hearing, but declining to weigh anything offered to negate the indictment, had initially donned the vestments of fairness, but had provided no reality under the masquerade.

Balancing of Interests

The exercise of discretion as to whether or not suspension is to be imposed should take into account not only the fact that there has been an indictment and that this has caused great public concern, but that individual rights may be curtailed or eliminated. It is apparent that the hearing committee gave great weight as to what the consequences of its decision would be to an association intent on avoiding any possible taint of scandal, but it does not appear that those considerations were balanced by any weighing of what the consequences of suspension would be to the individuals charged. Was there any attempt to weigh the balance of hardships? The Association suggests that no real problems are presented because it was a private organization and plaintiffs were free to withdraw if they did not agree to its procedures. This, of course, blinks the realities of the situation, for in light of the Association’s total control of the field of equestrian sport, there was no meaningful way in which plaintiffs could voluntarily withdraw.
Distinctions have to be made between charges which go to the heart of the integrity of a sport or business and those charges which are extrinsic to the sport or business itself. There is a serious risk in keeping a possible race fixer, an *955 embezzler, or a crooked policeman in a position where he can continue his misdeeds. A jockey accused of throwing a race, or a trainer accused of doping a horse, if he is kept on without further inquiry, can continue to tip the scale in future events, much more than one who has committed past perjury or tax fraud. The crimes here charged, although involving egregious cruelty to animals, do not directly impact on the conduct or the outcome of future horse shows and exhibitions. Even if plaintiffs had been guilty of insurance fraud, in the coming meets their horses would run no faster, jump no higher, nor perform any better. If they are suspect, they may not be given universal public approbation. But even under a cloud they may perform. If ultimately plaintiff Lindemann is convicted of the crime charged, he can be stripped of any titles and trophies he may have won. If he is acquitted after having been suspended, he has been denied any chance to compete, and unlike the ordinary job holder, he cannot be reinstated or compensated with back pay.
Some further comment is called for with respect to the broad sweep of the Association’s rule 704. That rule employs a kind of guilt by association to extend a suspension not only to the accused person but to his spouse, family members, companions, employees, agents or others, supposedly to avoid the appearance that the suspended person is attempting to evade the sanction by having someone else front for him. In actuality, this is a kind of Bill of Attainder. In feudal law, the attaint attached when a person was corrupted or stained by the commission of any felony, as a result of which there was a "corruption of blood” and his relatives and heirs forfeited their rights to his property. (2 Blackstone, Commentaries, at 251, 252.) This would appear to be too broad a sanction in the absence of some showing of an attempt to bypass the original sanction. To bar all relatives and associates as well as the accused person on the basis of an indictment appears to go too far.
Given the indictments, the burden of explanation, exculpation and mitigation can properly be placed on the persons charged, but an authentic opportunity to refute must be given. That has not been done here. The result appears to have been preordained once the accusation was made, as the Association scurried to cover itself. It is somewhat reminiscent of the old Western movies where the tough Sheriff said, "We have to get the trial over with first, and then we’ll hang him!”
Accordingly, the court concludes that the determination by *956 the Association suspending the plaintiffs was arbitrary and capricious and imposed without a meaningful hearing and in the absence of substantial evidence.
Therefore, that determination of the Association is nullified, and the Association is enjoined from proceeding with any suspension except after a hearing in accordance with the principles set forth above.

. An article in the November 16, 1992 issue of Sports Illustrated, entitled "Blood Money”, described instances of horse owners hiring "Killers to murder their animals for the insurance pay offs.” Included in the article were statements attributed to Burns identifying by name some of the horse owners who allegedly had paid him off, including George Lindemann, Jr. (Lindemann), who Tommy Burns alleged paid him $35,000 to electrocute a jumper named Charisma in order to collect the insurance proceeds.

. See, Jefpaul Garage Corp. v Presbyterian Hosp., 61 NY2d 442.

. See also Nebbia v New York (291 US 502, 525) in which the Supreme Court held "[a]nd the guaranty of due process, as has often been held, demands only that the law shall not be unreasonable, arbitrary or capricious, and that the means selected shall have a real and substantial relation to the object sought to be obtained.”